[No. S104019. June 3, 2004.]

GERAWAN FARMING, INC., Plaintiff and Appellant, v.
A.G. KAWAMURA, as Secretary, etc., Defendant and Respondent.

2

## COUNSEL

Erik S. Jaffe; Brian C. Leighton; Mayer, Brown & Platt, Mayer, Brown, Rowe & Maw, Michael W. McConnell, Craig Canetti and Sharon Swingle for Plaintiff and Appellant.

King & Spalding, Steven G. Brody, Jeanette M. Viggiano; Daniel J. Popeo, Richard Samp, R. Shawn Gunnarson; Susan Liebeler; Thomas, Walton & Graves and John R. Walton for Washington Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Mary E. Hackenbracht, Linda Berg, Ronald A. Reiter, Seth E. Mermin and Tracy L. Winsor, Deputy Attorneys General, for Defendant and Respondent.

Kahn, Soares & Conway, George H. Soares, Dale A. Stern and Robert S. Hedrick for California Avocado Commission, California Apple Commission, California Asparagus Commission, California Cut Flower Commission, California Date Commission, California Egg Commission, California Forest Products Commission, California Grape Rootstock Improvement Commission, California Kiwifruit Commission, Lake County Winegrape Growers Commission, Lodi-Woodbridge Winegrape Growers Commission, California Pepper Commission, California Pistachio Commission, California Rice Commission, California Sheep Commission, California Strawberry Commission, California Tomato Commission, California Walnut Commission and California Wheat Commission as Amici Curiae on behalf of Defendant and Respondent.

Baker, Manock & Jensen, Kendall L. Manock, Robert D. Wilkinson, Kathleen A. Meehan; Wilmer Cutler Pickering and Seth P. Waxman for the California Table Grape Commission as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**MORENO, J.**—In *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan I*), we held that an agricultural producer's right to free speech under article I, section 2, subdivision (a) of the California Constitution (hereafter sometimes article I or the free speech clause)[1] was implicated by a program that compelled that producer to fund generic advertising about various agricultural products. In so holding, we parted company with the United States Supreme Court, which had held in *Glickman v. Wileman Brothers & Elliott, Inc.* (1997) 521 U.S. 457 [138 L.Ed.2d 585, 117 S.Ct. 2130] (hereafter sometimes *Glickman*) that a similar generic advertising program did not implicate the free speech clause of the First Amendment to the United States Constitution, but rather was a kind of economic regulation outside the sphere of First Amendment doctrine. The *Gerawan I* court did not, however, determine whether compelled funding of the generic advertising program at issue violated article I nor decide upon the proper test to be employed in making that determination. We left that task to the Court of Appeal on remand.

The Court of Appeal concluded that the program to which plaintiff Gerawan Farms, Inc. (Gerawan), objected was unconstitutional because, as discussed below, it was not supported by a valid government interest, owing to the fact that it had to be approved by a private association. We granted review specifically to assess the validity of this holding and more generally to address the constitutional questions remaining from *Gerawan I*. We conclude the compelled funding of generic advertising in this case should be tested by the intermediate scrutiny standard articulated by the United States Supreme Court in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*), and that remand for further factfinding is required to determine whether the program at issue is constitutional. We conclude as well the Secretary of Food and Agriculture's (Secretary) claim that the generic advertising in question is constitutional because it is government speech also cannot be resolved on the pleadings and requires further factfinding. We also reaffirm our holding in *Gerawan I* that the marketing program in question does not violate the First

---

[1] Article I, section 2, subdivision (a) states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

Amendment, rejecting Gerawan's argument that the holding requires revision in light of the United States Supreme Court's most recent pronouncement on the compelled funding of generic advertising in *United States v. United Foods, Inc.* (2001) 533 U.S. 405 [150 L.Ed.2d 438, 121 S.Ct. 2334] (*United Foods*).

## I. FACTUAL BACKGROUND

Much of the factual background to this case may be found in *Gerawan I*. We began our analysis by discussing the legislative framework of the California Plum Marketing Program, which was enacted pursuant to the California Marketing Act of 1937 (CMA). As *Gerawan I* explained, the CMA and its federal counterpart, the Agricultural Marketing Agreement Act of 1937 (AMAA), were legislative responses to the severe problems that the agricultural sector of the economy found itself facing, which were exacerbated by the Great Depression. These programs were rooted in the considered legislative judgment that government intervention in agricultural markets was necessary to preserve the agricultural industry. (See *Gerawan I, supra,* 24 Cal.4th at pp. 476–477; see also *id.,* at pp. 524–525 (dis. opn. of George, C. J.).)

As elaborated by the Court of Appeal in *Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 907 [54 Cal.Rptr.2d 225], the CMA "grew out of the chaotic conditions which characterized California agriculture during the early part of the twentieth century. [Citation.] Before the promulgation of the CMA, each of California's many fruit and vegetable growers attempted to be the first in the market with his or her commodity, in order to take advantage of the premium prices paid on early shipments. This led to the marketing of inadequately ripened produce, and the glutting of the market during the peak season with poor quality commodities. Deceptive packaging, improper sampling, and false grading were often resorted to in order to attempt to enhance the attractiveness of the produce. This 'unregulated scramble' had an 'adverse effect upon consumer acceptance of California fruits and vegetables,' and the unstable and fluctuating markets 'had an exaggerated impact on the livelihood of' the state's agricultural producers. [Citation.] The depression of 1929–1933 only exacerbated these problems; the prices paid to growers 'plummeted.' [Citation.]"

Specifically, like the AMAA, "the CMA authorized . . . the Secretary of Food and Agriculture . . . to enter into 'marketing agreements,' i.e., contract-like arrangements with the producers and handlers of agricultural commodities concerning marketing matters, which would be binding, expressly, only on those signatory thereto, and would be exempt, impliedly, from all state antitrust laws." (*Gerawan I, supra,* 24 Cal.4th at p. 478.)

"[T]he CMA [also] authorized the [Secretary] to issue 'marketing orders,' i.e., regulations governing marketing matters for the producers and handlers of agricultural commodities, which did the following: provided for participation in the administration of such orders by the regulated producers and handlers themselves; substantially restricted the terms of such orders generally to, among others, the determination of the existence and extent of any surplus, the limitation on total quantity marketed, the allotment of amounts for purchase, the allotment of amounts for marketing, the regulation of periods for marketing, the establishment of reserve pools, the institution of grading and standards, and, impliedly, the conduct of research; and mandated that the regulated producers and handlers had to contribute funds to cover related expenses. . . .

"But, unlike the AMAA, the CMA authorized the [Secretary] to impose, among the terms of such a marketing order, the establishment of 'plans for advertising and sales promotion to create new or larger markets for agricultural commodities,' specifically, plans that are 'directed toward increasing the sale of such commodity without reference to a particular brand,' etc. (Stats. 1937, ch. 404, § 1, pp. 1335–1336.) It mandated that the regulated producers and handlers subject to a marketing order with such a term had to contribute funds to cover related expenses." (*Gerawan I, supra*, 24 Cal.4th at pp. 478–479.)

At controversy here, as in *Gerawan I*, is a 1994 marketing order issued by the Secretary pursuant to the CMA, entitled the California Plum Marketing Program. As *Gerawan I* described the program, according to Gerawan's first amended complaint: "The California Plum Marketing Program provides for the establishment of a California Plum Marketing Board, which is virtually filled with, and totally controlled by, producers and/or producer-handlers of the fruit. In addition, and among other things, it provides for the board's administration of its terms. It also provides for the board's undertaking of activities extending to research; advertising, specifically generic advertising, along with sales promotion and market development; and the institution and implementation of quality standards and inspections. It provides as well for the board's assessment of funds from producers for expenses related to the foregoing activities, at a rate that may not exceed $0.20 per 28-pound box, including $0.02 for research, $0.11 for generic advertising along with sales promotion and market development, and $0.07 for quality standards and inspections." (*Gerawan I, supra*, 24 Cal.4th at p. 480.)

It was the assessment of producers to pay for generic advertising that was the subject of the constitutional challenge. "On October 31, 1994, Gerawan Farming, Inc., filed a complaint for declaratory and injunctive relief in the Superior Court of Tulare County against, among others, the California

Secretary of Food and Agriculture in his official capacity . . . . It challenged the California Plum Marketing Program, which was issued by the secretary pursuant to the CMA, under provisions including the free speech clause of the First Amendment to the United States Constitution and the free speech clause of subdivision (a) of section 2 of article I of the California Constitution. It . . . alleged facts, liberally construed, to the following effect: It produces and handles plums; . . . it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; nonetheless, the California Plum Marketing Program compels it to fund commercial speech in the form of generic advertising about plums as a commodity against its will, and does so to some appreciable extent; the compulsion of funding reduces the amount of money available for its own advertising; the generic advertising, otherwise undescribed, 'reflect[s] . . . viewpoints,' political and ideological as well as commercial, 'to which it does not subscribe,' and indeed with which it 'vehemently disagrees.'

"Subsequently, in *Glickman*, a majority of the United States Supreme Court, in an opinion by Justice Stevens, concluded that Marketing Order No. 917, which was issued by the United States Secretary of Agriculture pursuant to the AMAA, did not implicate the right of parties including Gerawan to freedom of speech under the First Amendment by compelling funding of generic advertising. (*Glickman v. Wileman Brothers & Elliott, Inc.*, supra, 521 U.S. at pp. 467–477.) They indicated that, had such a right been implicated, the appropriate standard for use in determining whether it had been violated would have been the test of *Abood v. Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782] . . . and its progeny, including *Keller v. State Bar of California* (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228] . . . , which had *not* been used by the court below—which 'involv[es] the compelled funding of speech' generally [citation]—and not the test of *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] . . . , which *had* been used by the court below which 'involve[s] a restriction on commercial speech' [citation]. . . .

"The Secretary of Food and Agriculture moved for judgment on the pleadings on the ground that Gerawan's complaint did not allege facts sufficient to constitute a cause of action. By order, the superior court granted the motion, but with leave to amend.

"Gerawan proceeded to file an amended complaint. It challenged the California Plum Marketing Program under provisions including article I's free speech clause. It again alleged facts reflecting the historical, statutory, and administrative background, as set out above. [I]t also alleged [additional]

facts, liberally construed, to the following effect: . . . the California Plum Marketing Program compels it to fund commercial speech in the form of generic advertising about plums as a commodity against its will, and does so in excess of $80,000 per year; the compulsion of funding reduces the amount of money available for its own advertising; it 'disagrees' with, and indeed 'abhors,' the generic advertising, otherwise undescribed, both on political and ideological grounds, as 'socialistic' and 'collectivist,' and also on commercial grounds, as 'grouping all . . . plums as though they are the same' and as 'embarrassingly silly, idiotic and/or totally ineffective.' " (*Gerawan I, supra*, 24 Cal.4th at pp. 480–482, fn. omitted.)

The Secretary again moved for judgment on the pleadings and the superior court granted it, without leave to amend, stating that Gerawan " 'cite[d] no authority for its argument that the California Constitution extends protections against compelled speech . . . greater than those provided in the United States Constitution which the United States Supreme Court [in *Glickman*] has held were not violated by' Marketing Order No. 917, which it said was 'not substantively distinguishable from' the California Plum Marketing Program." (*Gerawan I, supra*, 24 Cal.4th at p. 482.)

The Court of Appeal upheld the trial court. This court reversed. As stated above, this court disagreed with *Glickman*'s conclusion that the compelled funding scheme of the California Plum Marketing Program does not implicate free speech, at least with respect to article I. But the court declined to address whether the program actually violated the free speech clause. Nor did it set forth the proper test for determining such violation, leaving those matters for the Court of Appeal on remand. (*Gerawan I, supra*, 24 Cal.4th at pp. 515–517.)

The Court of Appeal, in a two-to-one decision, held that the plum marketing program did indeed violate article I. The majority found it unnecessary to decide precisely which legal standard to employ. Rather, it held, as will be discussed at greater length below, that the program's compelled funding of generic advertising could not be constitutionally justified under any of the possible free speech tests because such generic advertising did not advance a valid government interest. The principal ground for this conclusion was that the determination whether to conduct the generic advertising program had been and could only be decided by a referendum of the agricultural growers, not by a governmental agency. As the court stated: "In the absence of an affirmative vote adopting a program, the Secretary has no power to implement the program, regardless how overwhelming the state's interest in addressing current conditions."

Justice Levy dissented, arguing essentially that the "germaneness" test proposed by *Abood v. Detroit Board of Education, supra*, 431 U.S. 209

(*Abood*), and *Keller v. State Bar of California, supra,* 496 U.S. 1 (*Keller*), to determine whether compelled funding of speech was constitutional should apply in the present case, and that referendum-approval procedures did not diminish the importance of the government interest. He would have remanded the case to the trial court for further development of the factual record. We granted review.

## II. Discussion

### A. *The Proper Constitutional Test*

There are several cases critical to our understanding of the present case and to the formulation of the proper test for determining whether the California Plum Marketing Program's mandatory fee to finance its generic advertising program violates article I. We review these cases below.

#### 1. *Abood and Keller*

*Abood* and *Keller* are the cornerstones of United States Supreme Court jurisprudence regarding government-compelled funding of private speech. In *Abood, supra,* 431 U.S. 209, dissident teachers objected to being charged mandatory union dues, pursuant to a state statute, claiming this charge violated their First Amendment rights. The court recognized that these mandatory assessments did indeed have an impact upon the dissident employees' First Amendment interests, but would nonetheless be constitutional under some circumstances. "An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike . . . while another might have economic or political objections to unionism itself. . . . The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But . . . such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress. . . . 'As long as [the union] act[s] to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy.' " (*Abood, supra,* at pp. 222–223, fn. omitted.)

On the other hand, the balance between First Amendment rights and a government interest tips the other way when the government would compel

an employee to fund union activity devoted to "an ideological cause" not directly related to the union's primary, collective bargaining function. (*Abood, supra*, 431 U.S. at p. 235.) "We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." (*Id.* at pp. 235–236, fn. omitted.)

In *Keller, supra*, 496 U.S. 1, the court extended *Abood*'s rationale to mandatory fees charged by the State Bar of California: "*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity." (*Keller, supra*, 496 U.S. at pp. 13–14.)

### 2. *Gerawan I and Glickman*

In *Gerawan I, supra*, 24 Cal.4th 468, the court recognized that a program very similar to the one at issue in this case had been upheld as constitutional under the First Amendment in *Glickman, supra*, 521 U.S. 457 [117 S.Ct. 2130], in which Gerawan itself had been a plaintiff. *Gerawan I*'s discussion and critique of *Glickman* is central to the resolution of this case and will be reviewed at length.

*Gerawan I* characterized *Glickman* as follows: "In *Glickman*, a majority sustained Marketing Order No. 917, issued by the United States Secretary of Agriculture pursuant to the AMAA against a challenge by Gerawan, among others, that it violated their First Amendment right to freedom of speech by compelling funding of generic advertising.

"At the outset, the *Glickman* majority 'stress[ed] the importance of the . . . context' established by the AMAA. (*Glickman v. Wileman Brothers & Elliott, Inc., supra*, 521 U.S. at p. 469.) They also emphasized that Marketing Order No. 917 was a 'detailed' 'regulatory scheme' that had 'displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws.' (*Ibid.*)

It 'compelled' Gerawan and the rest 'to fund the generic advertising at issue . . . as a part of a broader collective enterprise in which their freedom to act independently' was 'already constrained.' (*Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at p. 469.) [¶] . . . [¶]

"The *Glickman* majority went on to conclude that Marketing Order No. 917 did not even implicate, still less violate, the First Amendment right of Gerawan and the rest to freedom of speech by compelling funding of generic advertising. (See *Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at pp. 468, 473–474, fn. 16, & 476.) They considered the marketing order in question as merely a 'species of economic regulation,' no more and no less, without any effect on the right at issue. (*Id.* at p. 477.) They 'presume[d]' that Gerawan and the rest 'agree[d] with the central message of the speech that [was] generated by the generic [advertising].' (*Id.* at p. 470.) They did not measure the marketing order against the right, but rather purported to 'distinguish' the former out of the latter's scope. (*Id.* at p. 469.)" (*Gerawan I, supra,* 24 Cal.4th at pp. 499–500, fn. omitted.)

As recounted in *Gerawan I,* the *Glickman* court explained that the order neither restricted plaintiffs from speaking nor compelled them to speak. Most importantly, the *Glickman* majority stated that the order "did not 'compel' any person to fund any 'political or ideological' speech (*Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at pp. 469–470): The generic advertising amounted only to commercial speech, 'encouraging consumers to buy' the fruit indicated [citation]; it could not be 'said to engender any crisis of conscience' in political or ideological matters [citation] or to 'conflict with' anyone's ' "freedom of belief" ' in such areas [citation]; any objection against the generic advertising as political or ideological in character, for instance, as 'promot[ing] . . . "socialistic programs" ' [citation], was 'trivial' [citation]. Indeed, decisions such as *Abood* and its progeny, including *Keller,* stand for the proposition that a person who has lawfully been compelled to associate with others may be compelled to fund even political or ideological speech, without suffering a violation of his First Amendment right to freedom of speech, if the political or ideological speech in question is ' "germane" to the purposes' that ' "justified" ' the ' "compelled association" ' in the first place. [Citation.]" (*Gerawan I, supra,* 24 Cal.4th at p. 501.)

As we recognized in *Gerawan I, Glickman* also concluded that even if Marketing Order No. 917 did implicate plaintiffs' First Amendment rights, it did not violate them. "The 'test' of *Abood* and *Keller* would 'clearly' be 'satisfied in this case because . . . the generic advertising . . . is unquestionably germane to the purposes of the marketing order[] . . . .' (*Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at p. 473.)" (*Gerawan I, supra,* 24 Cal.4th at p. 501.) Finding the marketing program at issue in

*Gerawan I* "not materially different" from the one in *Glickman*, at least for First Amendment purposes (*Gerawan I, supra,* 24 Cal.4th at p. 508), the *Gerawan I* court held that program did not implicate, much less violate, the First Amendment. (*Gerawan I, supra,* 24 Cal.4th at p. 497.)

Turning to the California Constitution's free speech clause, the court found that the marketing program did indeed implicate that clause. It found article I's right to freedom of speech distinctive from the First Amendment right, as construed by the *Glickman* court, on essentially two grounds.

First, the court found *Glickman,* on its own terms, unpersuasive. It noted the extensive criticism that the *Glickman* court had received in concluding that the marketing order at issue did not even implicate the First Amendment. (See *Gerawan I, supra,* 24 Cal.4th at pp. 501–505, 511–512.) The *Gerawan I* court opined that *Glickman*'s "legal component is driven not so much by principled reasoning as by ad hoc distinguishing. Its factual component is hardly better." (*Id.* at p. 503.) The court, for example, found the *Glickman* majority's presumption that Gerawan and the rest " 'agree[d] with the central message of the speech that [was] generated by the generic [advertising], *Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at p. 470,' . . . betray[ed] a certain lack of sophistication," *Gerawan I* found, principally because producers who seek to develop their own brands may have that effort undermined by generic advertising and may therefore be said to disagree with that advertising. (*Gerawan I, supra,* 24 Cal.4th at pp. 503–504.)

The court found more persuasive the reasoning of Justice Souter's dissent: "Justice Souter observed that the First Amendment's right to freedom of speech does not bar compelling a speaker to fund speech that he otherwise would not fund *only when such speech would be political or ideological in character*—only when, in other words, it would 'engender' in him a 'crisis of conscience' (*Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at p. 472) or 'conflict with' his ' "freedom of belief" ' in such areas [citation]: Prior decisions such as *Abood* and its progeny including *Keller* happened to arise in the context of political or ideological speech—a mere 'fortuity'—but did not bar their application to commercial speech. (*Glickman v. Wileman Brothers & Elliott, Inc., supra,* 521 U.S. at p. 488 (dis. opn. of Souter, J.).) The fact that, under such decisions, a person who has lawfully been compelled to associate with others may be compelled to fund even political or ideological speech *without suffering a violation of the right in question* does *not* mean that he can be so compelled *without experiencing any implication of the right at all.* [Citation.]" (*Gerawan I, supra,* 24 Cal.4th at p. 502.) The *Gerawan I* court noted that the weight of scholarly authority appeared to side with Justice Souter's *Glickman* dissent, at least as to whether Marketing Order No. 917 implicated the First Amendment. (*Gerawan I, supra,* 24 Cal.4th at pp. 504–505.)

The second basis for *Gerawan I*'s departure from *Glickman* lay in the differences between article I and the First Amendment. Citing well-established case law, the *Gerawan I* court reaffirmed that article I's free speech clause is " 'broader' and 'greater' " than the First Amendment. (*Gerawan I, supra,* 24 Cal.4th at p. 491.) More specifically, "article I's right to freedom of speech, unlike the First Amendment's, is 'unlimited' in scope. [Citations.] Whereas the First Amendment does not embrace all subjects, article I does indeed do so, *in ipsissimis verbis*: 'Every person may freely speak, write and publish his or her sentiments *on all subjects* . . . .' " (*Id.* at p. 493, italics in *Gerawan I.*) The reference to "all subjects" obviously included commercial speech and therefore encompassed programs that compelled funding of speech. (*Ibid.*)

The historical circumstances surrounding the adoption of the predecessor to article I in 1849 also supported this conclusion. "In California . . . in 1849, the prevailing political, legal, and social culture was that of Jacksonian democracy. [Citations.] Jacksonian democracy was animated by 'ideals of equality and open opportunity.' [Citation.] Those ideals worked themselves out in a 'liberal, market-oriented, economic individualism.' [Citation.] What such individualism presupposed, and produced, was wide and unrestrained speech about economic matters generally, including, obviously, commercial affairs." (*Gerawan I, supra,* 24 Cal.4th at p. 495.) The court further concluded that nothing in the history of the subsequent amendments to that section of the California Constitution in 1879, 1974, and 1980 evinced an intent to change the original understanding of the 1849 Constitution with respect to commercial speech. (*Gerawan I, supra,* 24 Cal.4th at pp. 495–497.)

An examination of the briefs in the present case, both of the parties and amicus curiae, reveals considerable disagreement about the meaning of *Gerawan I.* In particular, Gerawan and his amicus curiae argue that *Gerawan I* stands for the proposition that commercial speech receives the same protection as political and ideological speech under article I, section 2, subdivision (a)—that is, it is subject to the strictest scrutiny. The Secretary and his amicus curiae dispute this point. Part of this confusion may stem from the fact that while *Gerawan I*'s discussion of article I, section 2, subdivision (a) and its history is broad and far ranging, its actual holding is extremely narrow. As the *Gerawan I* court stated: "Our conclusion, however, brings no conclusion to this cause. That the California Plum Marketing Program *implicates* Gerawan's right to freedom of speech under article I does not mean that it *violates* such right. But it does indeed raise the question. That question, in turn, raises others, including what test is appropriate for use in determining a violation. And *that* question, in *its* turn, raises still others as well, including what protection, precisely, does article I afford commercial speech, at what level, of what kind, and, perhaps 'most difficult,' subject to

what test. [Citation.] To address such questions belongs, in the first instance, to the Court of Appeal on remand." (*Gerawan I, supra,* 24 Cal.4th at p. 517, first two italics added.)

Thus, contrary to Gerawan's and amicus curiae's arguments, *Gerawan I* takes no position on the sort of constitutional protection the rights at issue in this case should receive. All the court held in *Gerawan I* is that a program that requires agricultural producers to fund nongovernmental commercial speech *implicates* article I's free speech clause, and that a court must conduct some unspecified inquiry into whether the program violates that clause. Although the *Gerawan I* court engaged in a general historical discussion, quoted in part above, in support of the position that compelled subsidization of commercial speech implicates the free speech clause (*Gerawan I, supra,* 24 Cal.4th at pp. 494–497), no specific constitutional test can be derived from that discussion.

### 3. *United Foods*

The United States Supreme Court further clarified its *Glickman* decision in *United Foods, supra,* 533 U.S. 405. In *United Foods,* the court considered the constitutional validity of a program authorized by the Mushroom Promotion, Research and Consumer Information Act (7 U.S.C. § 6101 et seq.). In practice, the program established pursuant to the act was almost exclusively for the purpose of subsidizing generic advertising. (*United Foods, supra,* 533 U.S. at p. 415.) In considering the constitutional validity of the program, the court acknowledged that the standards employed for determining the validity of restrictions on commercial speech were less exacting than for other forms of expression, citing the test found in *Central Hudson, supra,* 447 U.S. 557, and recognized that the test had been subject to criticism by members of the court. (*United Foods, supra,* 533 U.S. at pp. 409–410.) The court declined to resolve that controversy, stating that "even viewing commercial speech as entitled to lesser protection, we find no basis under either *Glickman* or our other precedents to sustain the compelled assessments sought in this case." (*Id.* at p. 410.)

*United Foods* began its analysis by affirming the principle that the First Amendment may, under certain circumstances, prohibit "compelling certain individuals to pay subsidies for speech to which they object," relying on *Abood* and *Keller.* (*United Foods, supra,* 533 U.S. at p. 410.) As the *United Foods* court further affirmed: "The fact that the speech is in aid of a commercial purpose does not deprive respondent of all First Amendment protection . . . ." (*Ibid.*) The court then turned to what it viewed as the key distinction between the case before it and *Glickman.* In *Glickman,* the compelled subsidy of speech was part of a detailed marketing order that had

" 'displaced competition' to such an extent that [it was] 'expressly exempted from the antitrust laws.' " (*United Foods, supra*, 533 U.S. at p. 412.) "Given that producers were bound together in [a] common venture, the imposition upon their First Amendment rights caused by using compelled contributions was, as in *Abood* and *Keller*, in furtherance of an otherwise legitimate program." (*United Foods, supra*, 533 U.S. at pp. 414–415.)

"The statutory mechanism as it relates to handlers of mushrooms is concededly different from the scheme in *Glickman*; here the statute does not require group action, save to generate the very speech to which some handlers object. In contrast to the program upheld in *Glickman*, . . . there is no broader regulatory system in place here. We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself. . . . The only program the Government contends the compelled contributions serve is the very advertising scheme in question. Were it sufficient to say speech is germane to itself, the limits observed in *Abood* and *Keller* would be empty of meaning and significance." (*United Foods, supra*, 533 U.S. at p. 415.)

The *United Foods* court rejected the government's argument that the *Abood* line of cases was concerned only with compelled subsidization of political speech or speech that violated the "freedom of belief." (*United Foods, supra*, 533 U.S. at p. 413.) "Before addressing whether a conflict with freedom of belief exists, a threshold inquiry must be whether there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place." (*Ibid.*)

Thus, although *United Foods* did not purport to overrule *Glickman*, and indeed took pains to distinguish *Glickman*, it appears to have modified *Glickman*'s holding in this sense: *United Foods* holds that the compelled funding of commercial speech does not violate the First Amendment *if* it is part of a larger marketing program, such as was the case in *Glickman*, and *if* the speech is germane to the purpose of the program. But that being the case, compelled funding of commercial speech must be said to implicate the First Amendment, i.e., such compelled funding requires a particular constitutional inquiry along the lines of *Abood* and its progeny. In other words, the United States Supreme Court appears to have distanced itself from *Glickman*'s conclusion that the generic advertising program does not implicate commercial speech because it does not "engender any crisis of conscience." (*Glickman, supra*, 521 U.S. at p. 472.) On this point, the United States Supreme Court now seems to be in agreement with *Gerawan I*. Furthermore, because the *United Foods* court did not overrule *Glickman*, the latter case can now most sensibly be read as simply holding that Market Order No. 917 did

not violate the First Amendment because it passed the *Abood* test. (See *Glickman, supra,* 521 U.S. at pp. 472–473.)

Gerawan contends that the California Plum Marketing Program does not pass the *United Foods* threshold. Gerawan made a very similar argument in its last appearance before this court in *Gerawan I,* which we rejected. Anticipating the distinction the high court recognized in *United Foods,* Gerawan quoted the *Glickman* majority's statement that Marketing Order No. 917 was a " 'detailed' 'regulatory scheme' that had 'displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws,' and accordingly 'compelled' Gerawan and the rest 'to fund the generic advertising at issue . . . as a part of a broader collective enterprise in which their freedom to act independently' was 'already constrained.' [Citation.] Gerawan then maintain[ed] that the California Plum Marketing Program is not such a 'detailed' 'regulatory scheme.' " (*Gerawan I, supra,* 24 Cal.4th at p. 507.)

The *Gerawan I* court rejected this argument. "Although plainly not identical, the California Plum Marketing Program and Marketing Order No. 917, so far as the *Glickman* majority's analysis is concerned, are not materially different. Marketing Order No. 917, among other things, provided for the undertaking, by the Plum Commodity Committee, of research and development projects, including advertising, and set out specific regulations regarding both fruit containers and packs and also fruit grades and sizes. The California Plum Marketing Program provides for the undertaking, by the California Plum Marketing Board, of research; advertising, specifically generic advertising, along with sales promotion and market development; and the institution and implementation of quality standards and inspections. It appears that a federal marketing order under the AMAA *might have* regulated more broadly and deeply than a state marketing order under the CMA. But Marketing Order No. 917 *did not in fact* regulate so much more broadly and deeply than the California Plum Marketing Program.

"At bottom, Gerawan would have us characterize Marketing Order No. 917 as a regulation of economic activity with an incidental effect on speech and the California Plum Marketing Program as a regulation of speech with an incidental effect on economic activity. We cannot do so. Contrary to Gerawan's assertion, the fact that the California Plum Marketing Program earmarks 55 percent of the funds assessed from producers for generic advertising along with sales promotion and market development, with only 35 percent for quality standards and inspections and only 10 percent for

research, does not cause it to 'stand[] alone . . . as a regulation of speech.' " (*Gerawan I, supra*, 24 Cal.4th at p. 508, fn. omitted.)[2]

In fact, *Gerawan I* explicitly distinguished the program in that case from the Mushroom Promotion, Research, and Consumer Information Act of 1990 at issue in *United Foods*, which, at the time *Gerawan I* issued, was pending before the United States Supreme Court: "In apparent contrast to both the AMAA and the CMA is the Mushroom Promotion, Research, and Consumer Information Act of 1990 [citation], which has been characterized as 'basically a commercial advertising statute designed to assess mushroom growers for the cost of advertising' (*United Foods, Inc. v. U.S.* (6th Cir. 1999) 197 F.3d 221, 222, fn. 1, cert. granted Nov. 27, 2000 . . .)." (*Gerawan I, supra*, 24 Cal.4th at p. 507, fn. 9; see also *id.*, at p. 508, fn. 10.)

■ Gerawan continues to argue that the chief distinction between the marketing orders in *Glickman* and in this case is that the former orders displaced competition, whereas the latter does not. This assertion is incorrect. As Justice Breyer noted in his dissent in *United Foods*: "Both then-existing federal regulations and Justice Souter's dissenting opinion make clear that, at least in respect to some of [*Glickman's*] marketing orders, price and output regulations, while 'authorized,' were not, in fact, in place. See 7 CFR pts. 916, 917 (1997) (setting forth container, packaging, grade, and size regulations, but not price and output regulations); [*Glickman, supra*,] 521 U.S., at 500, n. 13 (Souter, J., dissenting) (noting that 'the extent to which the Act eliminates competition varies among different marketing orders')." (*United Foods, supra*, 533 U.S. at p. 420, [121 S.Ct.2334] (dis. opn. of Breyer, J.).) This point is not controverted by the *United Foods* majority, which, as noted, did not purport to overturn *Glickman*. We thus do not understand *United Foods* as holding that the cooperative regulatory activity displacing competition must take the form of price regulations or output regulations in the strict sense. Rather, the cooperative regulations may simply control the quality or size of the product, as was the case in *Glickman* but not in *United Foods*. The California Plum Marketing Program, according to Gerawan's pleadings, is involved in that sort of activity and spends a substantial portion of its assessment on developing and enforcing quality standards. Moreover, as we recognized in *Gerawan I*, CMA marketing orders implicitly exempt those participating in a marketing agreement from state antitrust laws (*Gerawan I*,

---

[2] Justice Brown's concurring and dissenting opinion argues that the percentage of funds actually earmarked for generic advertising could be substantially higher than 55 percent. But Gerawan did not make any such allegation in its pleadings nor make any such argument before this court. Nor do we read *United Foods* to suggest that a marketing program is constitutionally invalid whenever more than 50 percent of its assessment is allocated to generic advertising.

*supra*, 24 Cal.4th at p. 478), a factor found significant in *Glickman* and *United Foods*. (See *Glickman*, *supra*, 521 U.S. at p. 461; *United Foods*, *supra*, 533 U.S. at p. 412.)

 Gerawan further argues that generic advertising is not necessary to the other parts of the marketing program, such as quality standards. What is required, however, is not necessity but germaneness. (See *United Foods*, *supra*, 533 U.S. at pp. 414–416; *Glickman*, *supra*, 521 U.S. at p. 473.) Here, as in *Glickman*, "the generic advertising of California [plums] is unquestionably germane to the purposes of the marketing order" (*Glickman*, *supra*, at p. 473), i.e., germane to the purpose of increasing the sale of particular California agricultural products.[3]

 In sum, as we concluded in *Gerawan I*, the program at issue in this case is not materially different from the one that passed constitutional muster in *Glickman*, which the *United Foods* majority expressly distinguished from the program it found constitutionally deficient. (*United Foods*, *supra*, 533 U.S. at pp. 411–414.) We therefore conclude the compelled funding of speech by the California Plum Marketing Program is part of a larger cooperative regulatory program with substantial nonexpressive elements (see *United Foods*, *supra*, 533 U.S. at p. 413), and therefore crosses the *United Foods* threshold. Accordingly, we reaffirm our holding in *Gerawan I* that the generic advertising program at issue here does not violate the First Amendment.

### 4. *The Proper State Constitutional Test*

As noted, the court in *Glickman* held that if the First Amendment had been implicated, then the "test" of *Abood* and *Keller* would "clearly [be] satisfied in this case because . . . the generic advertising . . . is unquestionably germane to the purposes of the marketing order[] . . . ." (*Glickman, supra*, 521 U.S. at p. 473.) As has been recognized, the standard employed

---

[3] Gerawan cites four recent federal appellate cases that invalidated programs of compelled contribution to generic advertising. It is clear that in three of the cases, the court concluded that the program at issue was essentially a stand-alone commercial advertising program indistinguishable from the program invalidated in *United Foods*. (See *Cochran v. Veneman* (3d Cir. 2004) 359 F.3d 263, 270 ["[t]he Dairy Act is a stand-alone law that was not passed as part of any other federal dairy regulatory scheme"]; *Michigan Pork Producers Ass'n, Inc. v. Veneman* (6th Cir. 2003) 348 F.3d 157, 162–163 ["the Pork Act is nearly identical in purpose, structure, and implementation" to the program invalidated in *United Foods* and does not "permit or require the imposition of quality standards for pork . . . products"]; *Delano Farms Co. v. Cal. Table Grape Comm'n* (9th Cir. 2003) 318 F.3d 895, 899 [about 90 percent of assessment spent on "generic promotional activities" and no general marketing order is applicable except in one location].) The United States Supreme Court has granted certiorari in the fourth case cited by Gerawan, *Livestock Marketing Ass'n v. U.S. Dept. of Agric.* (2003) 335 F.3d 711, certiorari granted May 24, 2004, No. 03-1164, 541 U.S. 1062 [158 L.Ed.2d 962, 124 S.Ct. 2389].)

by the *Glickman* court was "plainly less exacting" than the intermediate scrutiny test employed in testing the constitutionality of commercial speech restrictions. (*Gerawan I, supra,* 24 Cal.4th at pp. 534–535 (dis. opn. of George, C. J.).) In light of our recognition in *Gerawan I* that the generic advertising program does in fact implicate the free speech clause, that is to say, a program of compelled subsidization of generic advertising does interfere with the right protected under the free speech clause and requires some justification for that interference, we believe it would be incongruous to subject the program to only minimal scrutiny.

On this point we are partly persuaded by Justice Souter's dissent in *Glickman, supra,* 521 U.S. at page 477, wherein he points out that previous forays into compelled funding of speech have involved areas in which the importance of the government interest at stake and legitimacy of compelled association was already well established. Commenting on the seminal case of *Abood, supra,* 431 U.S. 209, Justice Souter reasoned that the court had concluded some interference with the First Amendment interests was " 'constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress.' [Citation]; see also *Keller, supra,* [496 U.S. at pp.] 13–14 ('[T]he State's interest in regulating the legal profession and improving the quality of legal services' justifies 'the compelled association [inherent in the] integrated bar'). But this was simply a way of saying that the government's objective of guaranteeing the opportunity for a union shop, the importance and legitimacy of which were already settled, [citations], could not be attained without the incidental infringements of the interests in unfettered speech and association that petitioners there claimed." (*Glickman, supra,* 521 U.S. at p. 484 (dis. opn. of Souter, J.).)

Justice Souter appears correct that an assumption underlying *Abood* and *Keller,* albeit an implicit one, is that the interest justifying the compelled association must be important, and that there be no effective alternative means of achieving this interest with less intrusion on free speech rights. On the other hand, the conclusion of the *Glickman* majority that the compelled funding of generic advertising requires only minimal scrutiny is at variance with the general rule that intrusion into free speech rights requires substantial justification, even when the intrusion is incidental to the enforcement of a content-neutral law. (See *O'Brien v. United States* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673].) The requirement of substantial justification is further supported by the fact that the right to free speech under the California Constitution is in some respects " 'broader' and 'greater' " than under the First Amendment. (*Gerawan I, supra,* 24 Cal.4th at p. 491, and cases cited therein.)

■ Because generic advertising was not self-evidently incidental to the functioning of some important, legislatively established institution, such as a union shop or an integrated state bar as in *Abood* and *Keller*, Justice Souter argued for treating compelled funding of such advertising the same as any other regulation implicating the right of commercial speech, subjecting it to the test articulated in *Central Hudson, supra*, 447 U.S. 557. That standard asks (1) "whether the expression is protected by the First Amendment," which means that the expression "at least must concern lawful activity and not be misleading"; (2) "whether the asserted governmental interest is substantial"; if yes to both, then (3) "whether the regulation directly advances the governmental interest asserted"; and (4) "whether it is not more extensive than is necessary to serve that interest." (*Id.* at p. 566.) We believe this intermediate standard appropriately protects the free speech rights article I was designed to safeguard. Drawing on constitutional doctrine summarized above, we conclude that the compelled funding of commercial speech neither warrants application of the strictest scrutiny reserved for such matters as the censorship or compelled utterance of noncommercial speech (see, e.g., *Texas v. Johnson* (1989) 491 U.S. 397, 412 [105 L.Ed.2d 342, 109 S.Ct. 2533]; *West Virginia Bd. of Ed. v. Barnett* (1943) 319 U.S. 624, 642 [87 L.Ed. 1628, 63 S.Ct. 1178]), nor can it pass muster simply because it is rationally based.

Turning to the present case, we apply the *Central Hudson* test to determine whether this case can be resolved on the pleadings. As explained, we conclude it cannot be and requires remand.

■ There can be no dispute that the first prong of the *Central Hudson* test—"whether the expression is protected by the First Amendment" (*Central Hudson, supra*, 447 U.S. at p. 566)—should be resolved in Gerawan's favor. After *Gerawan I*, it is established that the right not to contribute financially to a commercial message is protected by the free speech clause. Moreover, the right Gerawan seeks to exercise has nothing to do with untruthful or misleading speech on its part.

The second prong is whether the government interest is substantial. (*Central Hudson, supra*, 447 U.S. at p. 566.) The government's goal in promoting generic advertising schemes is, in the words of the legislation explaining the purpose of the CMA, to "[p]rovide methods and means for the maintenance of present markets, or for the development of new or larger markets, for commodities that are grown within this state . . . ." (Food & Agr. Code, § 58654, subd. (d); see *Voss v. Superior Court, supra*, 46 Cal.App.4th at pp. 907–908 [historical experience with agriculture prompted legislative intervention to improve agricultural markets].) We do not doubt, in the abstract, that the objective of maintaining and expanding markets for

agricultural products, thereby ensuring the viability of California agriculture, is a substantial objective. (See *Gerawan I, supra,* 24 Cal.4th at p. 524 (dis. opn. of George, C. J.) [explaining the unique position agriculture holds in the state and national economy].) Moreover, as discussed in the next part of this opinion, we reject the Court of Appeal's position that the government's interest is not substantial simply because the CMA has delegated the decision whether to create a marketing program in a given sector of the agricultural economy to the agricultural producers themselves. This case comes to us, however, on the pleadings. It cannot be definitively determined whether the above-stated statutory goals are in fact the goals of the marketing program at issue in this case, and further factfinding is required to ascertain the nature of the government's actual interest.

The third prong of the *Central Hudson* test is "whether the regulation directly advances the governmental interest asserted." (*Central Hudson, supra,* 447 U.S. at p. 566.) Here, "the State must demonstrate that the challenged regulation 'advances the Government's interest "in a direct and material way." ' [Citation.] That burden . . . ' "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." ' " (*Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 625–626 [132 L.Ed.2d 541, 115 S.Ct. 2371] (*Went For It*).)[4] Moreover, in the First Amendment intermediate scrutiny context, the government's position must be supported not merely by any evidence but by substantial evidence. (See *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 666 [129 L.Ed.2d 497, 114 S.Ct. 2445].) Given that this case has not advanced beyond the pleading stage, there is as yet no evidence in the record to support the government's position that generic advertising is an efficacious means of significantly improving the sale of agricultural products in this state. Accordingly, the case must be remanded for further factfinding on that point.

The fourth prong of the *Central Hudson* inquiry is "[w]hether [the regulation] is not more extensive than is necessary to serve [the government] interest." (*Central Hudson, supra,* 447 U.S. at p. 566.) What this prong requires " 'is a "fit" between the legislature's ends and the means chosen to accomplish those ends . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.' " (*Went For It, supra,* 515 U.S. at p. 632.) Again, without an

---

[4] We note that the Supreme Court in *Went For It, supra,* 515 U.S. 618, took the first prong of the *Central Hudson* test as a given and so designated what we are calling the third and fourth prongs of that test as the second and third prongs.

evidentiary record, we cannot say whether alternative, less-speech-restrictive programs would be less efficient or effective in accomplishing the government's objective. (See *Glickman, supra,* 521 U.S. at pp. 502–503 (dis. opn. of Souter, J.) [discussing marketing programs that give producers a choice whether to spend money on their own advertising or generic advertising].) However, we reject Gerawan's position that, as a matter of law, the government always has an alternative means of encouraging plum sales through subsidies drawn from general revenue. The government is not, per se, constitutionally forbidden from funding a marketing program by the financial contribution of those who benefit from it the most, rather than of the general taxpaying public, any more than it is forbidden to fund a state bar association from member dues rather than general revenues. (See *Keller, supra,* 496 U.S. at p. 12.)

In sum, we conclude this case must be remanded to the trial court for further factfinding to determine whether the California Plum Marketing Program is intended to promote the substantial government interest articulated in Food and Agricultural Code section 58654, subdivision (d), whether the generic advertising program at issue directly advances that interest, and whether it is narrowly tailored in light of the availability of less-speech-restrictive alternatives.

### B. *The Court of Appeal Opinion*

The Court of Appeal majority did not decide what test was proper to determine the constitutionality of the compelled funding of commercial speech. Instead, the court reasoned that all tests presuppose that the compelled funding is justified by a valid governmental interest. The court concluded that there was no such valid governmental interest in the present case because the marketing program must be approved by a majority of the growers: "The governmental interest in the present . . . program is tenuous and is based on findings of necessity that are wholly illusory, for a simple reason: under the current statute, the government is forbidden to enact a remedial program no matter how severe an economic crisis arises in the plum industry *unless a majority of growers wants the program.*" (Italics in original.) As the Court of Appeal elaborated: "Under the California Marketing Act, the Secretary . . . 'shall' hold a hearing to determine the necessity for and terms of a marketing order if he 'has reason to believe that the issuance of a marketing order . . . will tend to effectuate the declared policy of this chapter . . . .' (Food & Agr. Code, § 58771.) However, even after the Secretary makes findings of necessity for a marketing order (§ 58811), the *growers* are still empowered to reject that finding by voting against a proposed regulatory program. (§ 58993.) In the absence of an affirmative vote adopting a program, the Secretary has no power to implement the program,

regardless how overwhelming the state's interest in addressing current conditions: 'If the director . . . [cannot] make the finding that producers that are directly affected have approved the marketing order . . . , he *shall not* make the marketing order . . . effective.' (§ 58997, italics added.)

"Under these circumstances, it matters not that the government might have a substantial interest in instituting a regulatory program that retains the greatest range of freedom for growers, rejecting price and production controls in favor of advertising: in the absence of an affirmative and binding legislative or administrative determination that intervention in the market processes in the first instance is necessary, there is no legitimate basis for interference with the free speech rights of dissenting growers."

The Court of Appeal acknowledged that labor unions also generally authorize expenditures only by a vote of the membership, but reasoned that such programs are distinguishable from the program at issue in this case. "[I]t is readily apparent that the governmental interest in a voluntary program in the field of labor relations is far different from the governmental interest asserted in the field of voluntarily established marketing orders. In the case of labor relations, the very existence of a regulated structure in which workers can assert their demands and grievances seeks, in and of itself, to preserve a measure of labor peace. The *right* to act collectively—to seek to organize—in itself serves to protect workers from oppressive, disruptive employer actions. Regulation of the right to act collectively, in turn, protects employers from violence and overreaching by workers. [Citation.] That a collective bargaining unit sometimes results from concerted employee action is, of course, important; equally important, however, is the existence of a structured environment in which employees can attempt to reach that goal if they desire to do so.

"By contrast, there is no claim that the structure for petition and referendum on marketing orders serves any societal interest beyond the mere facilitation of decision making. The only aspect in which the government even asserts an interest is the final product, the *approved* marketing order. Far from asserting a public interest in the statutory structure for obtaining a marketing order, the [CMA] provides that applicants for a marketing order may be required to privately fund the 'expenses of preparing and making effective such marketing order' by depositing funds with the Secretary. (§ 58961.) Only if the marketing order is approved by referendum and implemented by the Secretary is the latter permitted to reimburse the applicant for those expenses. This funding mechanism adopted by the Legislature reflects a judgment that, until a marketing order is adopted, the process of adoption primarily serves private interests."

We find the Court of Appeal unpersuasive on this point—a weakness that is fatal to its conclusion. To be sure, the California Plum Marketing Board and the labor union serve different interests. Membership participation within labor unions ensures some degree of responsiveness to its members, which contributes to labor peace. Membership participation within agricultural marketing programs ensures that the programs themselves, and the various features thereof, will be adopted only if the requisite contingent of agricultural producers believes in their efficacy. (See *Glickman, supra,* 521 U.S. at p. 476.) Such participation may be a legitimate means of furthering the government interest. "The CMA constitutes a legislative entrustment of the power to regulate the marketing of agricultural commodities to those who produce or otherwise deal with such products, subject to the approval of the secretary." (*Voss v. Superior Court, supra,* 46 Cal.App.4th at p. 907.) As Justice Levy wrote in dissent to the Court of Appeal opinion: "[T]he Legislature has merely recognized its own limitations and has therefore entrusted certain aspects of the regulation of the agricultural commodities market to those who better understand the industry . . . ."

■ Indeed, the effect of the Court of Appeal's holding would be to conclude that a government interest becomes unimportant or less important when decisions about how to accomplish that interest are delegated to those most affected by those decisions. Not only is there no authority for that position, but it is inconsistent with this court's long recognition of the legitimacy of such delegation. (See *Brock v. Superior Court* (1937) 9 Cal.2d 291, 299 [71 P.2d 209] [predecessor of the CMA "not invalid merely because it provides for consent of interested persons to the contemplated regulation"].) We therefore conclude that the partial delegation of authority for the creation of generic advertising programs to agricultural producers does not by itself constitutionally invalidate such programs. Of course, the government must still show that the marketing program, as presently constituted, serves a substantial public interest and not merely private interests.

### C. *The Government Speech Argument*

The Secretary argues at length the generic advertising at issue here is a form of government speech subject to a very deferential constitutional standard of review. (See *Keller, supra,* 496 U.S. at pp. 12–13.) The Secretary's principal argument is that he must ultimately approve any generic advertising issued by the California Plum Marketing Board, which is itself organized pursuant to statute, and that therefore the speech is actually that of the State of California rather than of a private association.

Gerawan claims on the other hand that the Secretary's approval is a mere formality, that generic advertising is not authentically government speech

because it is funded by agricultural producers rather than taxpayers and originates from and is ultimately approved by those producers rather than the government. Gerawan also contends that *Gerawan I* considered and rejected the government speech argument and that conclusion remains the law of the case.

In *Gerawan I* we stated: "Whether, and how, article I's free speech clause may accommodate government speech [citation] is a question that we need not, and do not, answer. In its amended complaint, Gerawan did not allege facts that would show that generic advertising under the California Plum Marketing Program—which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves—amounts to speech of this sort. Neither did the Secretary of Food and Agriculture so claim in his motion for judgment on the pleadings. At oral argument, counsel for certain of the amici curiae supporting the secretary's position attempted to raise the point. Too little, too late." (*Gerawan I, supra*, 24 Cal.4th at p. 515, fn. 13.)

Of course, our conclusion in *Gerawan I* with respect to the government speech issue was based on Gerawan's pleading. Because we conclude that this case must be remanded for further factfinding, the government will have an opportunity to prove that the speech at issue was in fact government speech.

The kind of showing the government would be required to make has been suggested by the United States Supreme Court. In *United Foods* the court, in declining to consider a similar government speech argument on the grounds that the issue was not raised before the federal Court of Appeals, noted that "although the Government asserts that advertising is subject to approval by the Secretary of Agriculture, respondent claims the approval is *pro forma*. This and other difficult issues would have to be addressed were the program to be labeled, and sustained, as government speech." (*United Foods, supra*, 533 U.S. at p. 417.)

In *Keller*, the court rejected the argument that the State Bar's speech amounted to government speech and stated: "The State Bar of California is a good deal different from most other entities that would be regarded in common parlance as 'governmental agencies.' Its principal funding comes, not from appropriations made to it by the legislature, but from dues levied on its members by the board of governors. Only lawyers admitted to practice in the State of California are members of the State Bar, and all 122,000 lawyers admitted to practice in the State must be members. Respondent undoubtedly performs important and valuable services for the State by way of governance

of the profession, but those services are essentially advisory in nature." (*Keller, supra,* 496 U.S. at p. 11, fn. omitted.) Moreover, other courts considering the issue have found significant whether the commercial speech in question is attributed to the government or to the agricultural producers. (See *Cochran v. Veneman, supra,* 359 F.3d at pp. 273–274.)

In the present case, the marketing board is comprised of and funded by plum producers, and is in that respect similar to the State Bar. But, as *United Foods* suggests, the speech may nonetheless be considered government speech if in fact the message is decided upon by the Secretary or other government official pursuant to statutorily derived regulatory authority. Because there are factual questions that may be determinative of the outcome— for example, whether the Secretary's approval of the marketing board's message is in fact pro forma, whether the marketing board is in de facto control of the generic advertising program, and whether the speech is attributed to the government—this issue cannot be resolved on the pleadings and requires further factfinding.

## III. DISPOSITION

The Court of Appeal reversed the trial court's judgment on the pleadings in favor of the government. We affirm this portion of the Court of Appeal's opinion. The Court of Appeal also stated in its disposition: "The matter is remanded to the trial court for trial and determination of the amount of assessments allocated to speech functions of the California Plum Marketing Board. Appellant is entitled to an injunction prohibiting enforcement of assessments against objecting growers and handlers to the extent those assessments are for speech-related purposes as described above. Appellant is entitled to its costs on appeal." We reverse this portion of the Court of Appeal's judgment, and instead remand for proceedings consistent with the views expressed in this opinion.

George, C. J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—At issue here is whether compelled funding of commercial speech violates plaintiff's free speech rights under the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 2, subd. (a).) With respect to the California Constitution, I agree with the majority that the applicable test is the one articulated by the high court in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*). And I agree with the majority's remand of that state constitutional issue to the trial court for factfinding regarding the details of the generic advertising program in question here. In addition, I agree with the majority's reconsideration of our earlier determination that the challenged program does not violate

the First Amendment. (See *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 497 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan I*).) But I disagree with the majority's conclusion that the facts alleged here are insufficient to state a violation of the First Amendment.

## I.

This case is similar to several lawsuits filed by others across the nation challenging on free speech grounds certain agricultural marketing programs. At issue in these cases are government-sanctioned agricultural programs that require growers or distributors to fund "generic" advertising, that is, advertising that urges the public to buy an agricultural commodity such as mushrooms or plums without distinguishing the products of any particular grower or distributor. The first case to reach the United States Supreme Court was *Glickman v. Wileman Brothers & Elliott, Inc.* (1997) 521 U.S. 457 [138 L.Ed.2d 585, 117 S.Ct. 2130] (*Glickman*). In that case, which arose in California, the high court concluded that two tree fruit marketing orders were merely "a species of economic regulation" that did not implicate the First Amendment rights of the objecting growers and distributors. (*Id.* at p. 477.) Four years later, the high court decided *United States v. United Foods, Inc.* (2001) 533 U.S. 405 [150 L.Ed.2d 438, 121 S.Ct. 2334] (*United Foods*), in which the court struck down a federal program that required mushroom distributors to fund generic advertising. The court held that the program violated the First Amendment because it did not "require group action, save to generate the very speech" to which the plaintiffs objected. (*Id.* at p. 415.)[1]

Here, plaintiff Gerawan Farming, Inc. (Gerawan) contends that the plums it developed, grows and distributes are superior to plums grown and marketed by others, and it therefore objects to the plum marketing order compelling it to contribute to the cost of generic advertising for plums. It sued California's Secretary of Food and Agriculture, contending that the marketing order violated Gerawan's free speech rights under both the federal and state Constitutions. As an aside, this is the second time the case has reached this court. In *Gerawan I, supra,* 24 Cal.4th 468, we reversed in part the Court of Appeal after it affirmed the trial court's grant of the state's motion for judgment on

---

[1] The high court has just granted certiorari in another case involving generic marketing orders, *Livestock Marketing Ass'n v. U.S. Dept. of Agric.* (8th Cir. 2003) 335 F.3d 711, 717, cert. granted *sub nom. Veneman v. Livestock Marketing Ass'n* (May 24, 2004, No. 03-1164) 541 U.S. 1062 [158 L.Ed.2d 962, 124 S.Ct. 2389], and *Nebraska Cattlemen, Inc. v. Livestock Marketing Ass'n* (May 24, 2004, No. 03-1165) 541 U.S. 1062 [158 L.Ed.2d 962, 124 S.Ct. 2390]. At issue is whether a United States Department of Agriculture program violates the First Amendment rights of American beef producers by requiring them to pay for advertisements such as "Beef: It's What's for Dinner," which do not distinguish between American and foreign beef.

the pleadings, ruling that Gerawan's complaint failed to state a cause of action under either the state or federal Constitution.

This court decided *Gerawan I* after the United States Supreme Court's decision in *Glickman, supra,* 521 U.S. 457, but before its decision in *United Foods, supra,* 533 U.S. 405. I joined Justice Stanley Mosk's majority opinion in *Gerawan I,* which in rejecting Gerawan's First Amendment claim relied on the holding in *Glickman* that the compelled funding of generic advertising was merely "a species of economic regulation" that did not implicate the First Amendment. (*Gerawan I, supra,* 24 Cal.4th at p. 500.) With respect to the California Constitution's free speech clause, *Gerawan I* viewed the protection afforded under that clause as " 'broader' and 'greater' " than its federal counterpart. (*Id.* at p. 491.) But *Gerawan I* did not set forth any test to determine whether compelled funding of commercial speech violates the state Constitution, instead remanding the case to the Court of Appeal. Thereafter, the Court of Appeal, without articulating a test, held that the compelled funding violated California's free speech clause. The court reasoned that because the Legislature had left to a majority of plum growers the decision whether to adopt a marketing order for plums, the compelled funding of generic advertising did not serve a governmental interest.

Again this court granted review, and it now reverses the Court of Appeal. This time, however, the majority sets forth a test to determine whether compelled funding of commercial speech violates the free speech clause of our state Constitution. (Cal. Const., art. I, § 2, subd. (a).) The test is the one that was articulated by the United States Supreme Court in *Central Hudson, supra,* 447 U.S. 557. That test asks (1) whether "the asserted governmental interest" underlying the regulation of commercial speech "is substantial"; (2) "whether the regulation directly advances the governmental interest asserted"; and (3) "whether it is not more extensive than is necessary to serve that interest." (*Id.* at p. 566.) In *Central Hudson,* that test was used to ascertain the constitutionality of a New York State utility regulation *banning* commercial advertising. But 17 years later, in *Glickman, supra,* 521 U.S. 457, three of the high court's four dissenters in that case—Justice Souter joined by Chief Justice Rehnquist and by Justice Scalia—would have applied that same test (*Central Hudson*) to *compelled funding* cases. (See *Glickman, supra,* at pp. 491–504 (dis. opn. of Souter, J.).)

The *Central Hudson* test is more protective of commercial speech rights than the First Amendment test endorsed by a majority of the high court in compelled funding cases. The latter asks only if the compelled funding is "ancillary to" some comprehensive regulatory program. (*United Foods, supra,* 533 U.S. at p. 411.) In light of this court's holding in *Gerawan I* that the protection under the California Constitution's free speech clause is greater

than that afforded under the First Amendment to the federal Constitution, I agree with the majority here that the *Central Hudson* test governs the state constitutional issue in this case.

I also agree with remanding this matter to the trial court. Although the Court of Appeal may ultimately prove correct in its conclusion that the plum marketing order at issue here lacks any substantial governmental purpose (a conclusion fatal to the "compelled funding of speech" aspect of the program because it would fail the first of the three-part *Central Hudson* test), I agree with the majority that the parties should have a chance to litigate the scope and contours of the program before the trial court.

## II.

My disagreement with the majority lies in its conclusion that the plum marketing order's compelled funding of commercial speech *does not* infringe Gerawan's free speech rights under the First Amendment of the federal Constitution. Given this court's conclusion in *Gerawan I* that, applying the high court's then-controlling decision in *Glickman, supra,* 521 U.S. 457 [117 S.Ct. 2130], the plum marketing program did not "implicate" the First Amendment, an explanation is in order. As mentioned earlier, after this court's 2000 decision in *Gerawan I,* the United States Supreme Court, seven months later, held in *United Foods, supra,* 533 U.S. 405, that compelled funding of commercial speech violates the First Amendment if it is not "ancillary to" a comprehensive marketing program. (*United Foods, supra,* 533 U.S. at p. 411.) That holding now casts doubt on our conclusion in *Gerawan I,* which was compelled by the high court's earlier decision in *Glickman, supra,* 521 U.S. 457, that there was no violation of Gerawan's free speech rights under the federal Constitution.

Thus, unlike Justice Brown (conc. & dis. opn. of Brown, J., *post,* at p. 33), I agree with the majority that, in light of recent developments in the high court's jurisprudence in the area at issue, we *must* reconsider our conclusion in *Gerawan I* that the plum order did not "implicate" the First Amendment to the federal Constitution.[2]

---

[2] Furthermore, because in *Gerawan I* our remand to the Court of Appeal encompassed *only* the issue whether the plum marketing order violated the California Constitution's free speech clause, Gerawan's additional contention that the order violated the First Amendment (a contention *this court* had rejected) was not before that court on remand. Accordingly, Gerawan was entirely correct, after the high court decided *United Foods, supra,* 533 U.S. 405, to raise the issue in this court, asking us in light of that recently decided case to reconsider our rejection of its First Amendment argument in *Gerawan I.*

Although the majority is right in reconsidering the First Amendment issue, it is wrong in rejecting it on the merits based on the allegations in Gerawan's complaint. The majority asserts those allegations do not state a First Amendment claim under *United Foods, supra,* 533 U.S. 405. (Maj. opn., *ante,* at p. 19 ["according to Gerawan's pleadings," the program constitutes cooperative regulatory activity that controls the quality and size of the product and that "spends a substantial portion of its assessment on developing and enforcing quality standards"].) I disagree. Gerawan's complaint does state a cause of action under the First Amendment that the compelled funding of the commercial speech aspect of the plum marketing order was not "ancillary to" a comprehensive marketing program, as required by *United Foods*; that is, the program does not "require group action" other than that necessary "to generate the very speech" to which Gerawan objects. (*United Foods,* at pp. 411, 415.) On that basis, I would allow Gerawan to pursue its First Amendment challenge to the plum order in the trial court.

As noted earlier, this case is before us after the trial court granted the motion for judgment on the pleadings made by the state Secretary of Food and Agriculture. As relevant here, granting such a motion is proper only if the plaintiff's "complaint does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii).) A motion for judgment on the pleadings has the same " 'purpose and effect of a general demurrer.' " (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146 [44 Cal.Rptr.2d 441, 900 P.2d 690].) As with a demurrer, therefore, both a trial and a reviewing court must liberally construe the pleadings " 'with a view to attaining substantial justice among the parties.' " (*Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 486 [229 Cal.Rptr. 324, 723 P.2d 64]; *Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 244–245 [74 Cal.Rptr. 398, 449 P.2d 462]; see Code Civ. Proc., § 452.) If there is a reasonable possibility that an amendment will cure an inherent defect in a complaint, a reviewing court should not affirm a trial court's order granting judgment on the pleadings unless the plaintiff has been given an opportunity to amend its complaint. (See *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 385 [2 Cal.Rptr.3d 655, 73 P.3d 517]; *Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113 Cal.Rptr. 102, 520 P.2d 726].)

Here, Gerawan's complaint alleges that the "primary purpose" of the plum marketing program is a "promotion and market development program consisting of a 'generic' advertising program and other speech related activities," but that it also includes "forced inspection regarding maturity, color, and other quality factors" as well as "general research, [and] educational programs." It further alleges that of the 20-cent assessment on each 28-pound plum container, 11 cents funds the generic advertising, with only 2 cents spent on research and 7 cents on quality control and inspection. These allegations that *more than half* of the assessment is used to fund generic advertising, and that

such advertising "and other speech related activities" constitute the *"primary purpose"* of the plum program are sufficient to state a cause of action that the program violates the First Amendment. In two cases presenting substantially similar facts to those alleged by Gerawan in this case, the federal Courts of Appeals for the Sixth and Eighth Circuits recently concluded that agricultural marketing orders violated the First Amendment. (See *Michigan Pork Producers Ass'n, Inc. v. Veneman* (6th Cir. 2003) 348 F.3d 157, 163; *Livestock Marketing Ass'n v. U.S. Dept. of Agric., supra,* 335 F.3d 711, 717, cert. granted *sub nom. Veneman v. Livestock Marketing Ass'n* (May 24, 2004, No. 03-1164) 541 U.S. 1062 [158 L.Ed.2d 962, 124 S.Ct. 2389] and *Nebraska Cattlemen, Inc. v. Livestock Marketing Ass'n, supra,* 541 U.S. 1062 [158 L.Ed.2d 962, 124 S.Ct. 2390].)

Even were one to entertain a doubt as to the sufficiency of Gerawan's allegations in stating a First Amendment claim, the majority—in light of the fact that Gerawan filed its complaint on January 31, 1994, more than seven years before the high court's recent decision in *United Foods, supra,* 533 U.S. 405, and consistent with this court's own precedents discussed above— should have granted Gerawan leave to amend its complaint.

Because of my conclusion that Gerawan's complaint does state a cause of action for violation of its free speech rights under the First Amendment, I would reverse the trial court's grant of the motion for judgment on the pleadings made by the California Secretary for Food and Agriculture on Gerawan's First Amendment claim, and I would remand this case in its entirety to the trial court.

**BROWN, J.,** Concurring and Dissenting.—I agree that, in determining whether a program that compels the funding of generic advertising violates article I, section 2, subdivision (a) of the California Constitution, courts should apply the intermediate scrutiny standard articulated by the United States Supreme Court in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343]. In this respect, I find persuasive Justice Souter's discussion of the *Central Hudson* test in *Glickman v. Wileman Brothers & Elliott, Inc.* (1997) 521 U.S. 457, 491–505 [138 L.Ed.2d 585, 117 S.Ct. 2130] (dis. opn. of Souter, J.) (*Glickman*). I also agree that a "remand for further factfinding is required to determine whether the program at issue" satisfies the *Central Hudson* test and/or whether "the generic advertising in question is constitutional because it is government speech . . . ." (Maj. opn., *ante,* at p. 6.)

But I disagree with the majority's decision to reaffirm our holding in *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan I*) "that the marketing program in question does not

violate the First Amendment" despite "the United States Supreme Court's most recent pronouncement on the compelled funding of generic advertising in *United States v. United Foods, Inc.* (2001) 533 U.S. 405 [150 L.Ed.2d 438, 121 S.Ct. 2334] (*United Foods*)." (Maj. opn., *ante*, at pp. 6–7.) As an initial matter, I do not believe this issue is properly before us. Although we decided the federal constitutional issue in *Gerawan I* before the United States Supreme Court decided *United Foods*, neither party asked the Court of Appeal to revisit this issue on remand, and the court did not do so. Indeed, the Court of Appeal followed our instructions in *Gerawan I, supra,* 24 Cal.4th at page 517, by *only* considering whether the California Plum Marketing Program violated California's free speech clause. The parties did discuss *United Foods* in the course of addressing the proper standard under California's free speech clause. But, once the majority declined to adopt the *United Foods* standard as the standard under the California Constitution (see maj. opn., *ante*, at pp. 20–21), it had no further need to apply it to this case. I therefore see no reason for us to reach out and decide an issue that our Courts of Appeal have not had an opportunity to fully address.

Moreover, the United States Supreme Court has recently decided to revisit the issue of whether the compelled funding of generic advertising violates the First Amendment. (See *Veneman v. Livestock Marketing Ass'n* (May 24, 2004, No. 03-1164) 541 U.S. 1062 [158 L.Ed.2d 962, 124 S.Ct. 2389].) Thus, any decision we render will likely be moot within a year. In any event, the high court presumably granted the petition for writ of certiorari because the federal Courts of Appeals have apparently recognized "at least four variations" of the federal constitutional "standard for determining the validity of laws compelling commercial speech" since *United Foods.* (*Cochran v. Veneman* (3d Cir. 2004) 359 F.3d 263, 277.) Given this confusion over the proper standard under the federal Constitution, I see no reason to wade into this thicket where, as here, the United States Supreme Court will resolve it shortly and the resolution of the state constitutional question may render the federal constitutional question moot.

If, however, we must address the federal constitutional issue, I do not believe we can simply rely on our analysis in *Gerawan I* in concluding that the California Plum Marketing Program is constitutional. In my view, *United Foods*—which focuses on the *actual* extent of regulation in the relevant market—casts doubt on our reasoning in *Gerawan I.* As such, I believe that a remand for further factfinding is also necessary in order to determine whether the program violates the First Amendment.

In resolving the federal constitutional issue in *Gerawan I*, we compared the California Plum Marketing Program and its enabling statute—the California Marketing Act of 1937 (CMA)—with the federal marketing order—

Marketing Order No. 917—and enabling statute—the Agricultural Marketing Agreement Act of 1937 (AMAA)—at issue in *Glickman.* (See *Gerawan I, supra,* 24 Cal.4th at pp. 507–508.) After making this comparison, we observed that the CMA was not materially different from the AMAA (*Gerawan I,* at p. 508), and that the federal marketing order at issue in *Glickman "did not in fact* regulate so much more broadly and deeply than the California Plum Marketing Program" (*Gerawan I,* at p. 508). Based on these similarities, we held that *Glickman*—which upheld the constitutionality of Marketing Order No. 917—established that the California Plum Marketing Program did not violate the First Amendment. (See *Gerawan I,* at p. 508.)

Using the same reasoning, the majority reaffirms the constitutionality of the California Plum Marketing Program in light of the United States Supreme Court's decision in *United Foods.* (See maj. opn., *ante,* at pp. 16–20.) But *United Foods* does not appear to support the majority's reasoning. In *United Foods,* the United States Supreme Court held that a federal marketing order issued pursuant to the Mushroom Promotion, Research, and Consumer Information Act (MPRCIA) did not satisfy the test for compelled speech established in *Abood v. Detroit Bd. of Ed.* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782], and *Keller v. State Bar of Cal.* (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228], and was therefore unconstitutional. (*United Foods, supra,* 533 U.S. at pp. 413–417.) To reach this holding, the court carefully distinguished the MPRCIA marketing order from the federal marketing order found constitutional in *Glickman.* According to the court, "[i]n *Glickman* the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy." (*United Foods,* at p. 411.) By contrast, the "advertising itself . . . [was] the principal object of the regulatory scheme" at issue in *United Foods.* (*Id.* at pp. 411–412.)

The United States Supreme Court did not reach this conclusion by simply comparing the enabling statutes and the marketing orders at issue in *United Foods* and *Glickman.* Instead, the court considered "the entire regulatory program" (*United Foods, supra,* 533 U.S. at p. 412), and asked whether the mushroom market was, *in reality,* as heavily regulated as the tree fruit market in *Glickman.* Because there were "no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions" (*United Foods,* at p. 412), the court concluded that "there is no 'heavy regulation through marketing orders' in the mushroom market" (*id.* at p. 413). Although "greater regulation of the mushroom market might have been implemented under the" AMAA, "the compelled contributions for advertising [were] not part of some broader regulatory scheme." (*United Foods,* at p. 415.) By contrast, the California tree fruit market was subjected to " 'detailed marketing orders' " containing various regulations that substantially limited the marketing autonomy of producers. (*Id.* at p. 412, quoting

*Glickman, supra,* 521 U.S. at p. 469.) And, although these orders varied in the extent that they eliminated competition (see *United Foods,* at p. 420), they "to a large extent deprived producers of their ability to compete and replaced competition with a regime of cooperation" (*id.* at p. 414). The court therefore held that "[t]he cooperative marketing structure relied upon by a majority of the Court in *Glickman* to sustain an ancillary assessment finds no corollary here." (*Id.* at p. 415.)

Thus, under *United Foods,* courts must focus on the *actual* extent of regulation in the market at issue in order to determine whether the compelled funding of speech violates the federal Constitution. If the mandatory assessments are part of a comprehensive regulatory scheme that actually limits the autonomy of its participants and establishes a broader collective enterprise, then they are constitutional. Absent such a regulatory system, however, they are not.

Based on the limited record before us, I do not believe we can conclude that the California Plum Marketing Program is "ancillary to a more comprehensive program restricting marketing autonomy" like the marketing orders at issue in *Glickman.* (*United Foods, supra,* 533 U.S. at p. 411.) The marketing orders at issue in *Glickman* contain extensive and detailed regulations giving the Secretary of Agriculture broad authority to regulate the tree fruit market. (See, e.g., 7 C.F.R. §§ 916.52, 917.41 (2004).) And these regulations actually and substantially limit the autonomy of the participants (see, e.g., 7 C.F.R. §§ 916.55, 916.350, 916.356, 917.45, 917.442, 917.459, 917.461 (2004)), as well as impose extensive reporting requirements (see, e.g., 7 C.F.R. §§ 916.60, 917.50 (2004)).

By contrast, there is no evidence in the limited record before us that the California Plum Marketing Program does the same. The general provisions of the California Plum Marketing Program relating to research and quality standards and inspections found in the record do not appear to establish the actual extent of regulation in the California plum market. These provisions therefore do not, by themselves, establish a market characterized by "[c]ollective action, rather than the aggregate consequences of independent competitive choices," like the tree fruit market in *Glickman.* (*Glickman, supra,* 521 U.S. at p. 461.) Moreover, the California Plum Marketing Program permits an assessment of up to 11 cents per 28-pound box for generic advertising, but only permits an assessment of up to 2 cents per box for research activities and up to 7 cents per box for quality standards and inspection activities. (See *Gerawan I, supra,* 24 Cal.4th at p. 480.) The program therefore contemplates the use of *55 percent* of the funds assessed for generic advertising alone. And the *actual* percentage of assessed funds earmarked for generic advertising could be even higher. Thus, absent evidence of the actual percentage of

assessed funds used for generic advertising, " 'the principal object of the' " program is arguably " 'commercial speech itself' " in violation of the First Amendment. (*Livestock Marketing Ass'n v. United States Dept. of Agriculture* (8th Cir. 2003) 335 F.3d 711, 717 [holding that a marketing order violated the federal Constitution in light of *United Foods* because " 'at least 50% of the assessments collected and paid . . . are used for advertising' "], cert. granted *sub nom. Veneman v. Livestock Marketing Ass'n, supra,* 541 U.S. 1062 [158 L.Ed2d 962, 124 S.Ct. 2389].)

Thus, without an evidentiary record establishing the actual extent of regulation of the California plum market, we cannot say whether the California Plum Marketing Program "is part of a larger cooperative regulatory program with substantial nonexpressive elements" as understood in *United Foods.* (Maj. opn., *ante,* at p. 20.) Accordingly, I believe we must remand for further factfinding if we choose to address the issue of whether the compelled funding of advertising at issue here violates the federal Constitution.

Ruvolo, J.,[*] concurred.

---

[*]Associate Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.