UNITED STATES of America ex rel. Gareld J. KNEEPKINS, Plaintiff,

v.

GAMBRO HEALTHCARE, INC.; Dialysis Holdings, Inc.; and Transitional Hospitals Corporation, Inc., Defendants.

No. Civ.A. 97–10400–GAO.

United States District Court, D. Massachusetts.

July 18, 2000.

Susan G. Winkler, United States Attorney's Office, Boston, MA, for Plaintiff.

Joshua T. Buchman, McDermott, Will & Emery, Chicago, IL, for Defendants.

**MEMORANDUM AND ORDER**

O'TOOLE, District Judge.

The government's complaint asserts that predecessor corporations of the three named defendants, Gambro Healthcare, Inc., Dialysis Holdings, Inc., and Transitional Hospitals Corporation, Inc., engineered a scheme to defraud Medicare by performing unnecessary and wasteful blood tests at a medical testing laboratory in Smyrna, Georgia.[1] Three of the seven counts arise under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (2), and (3); the other four assert common law claims for fraud, payment by mistake of fact, unjust enrichment, and disgorgement of illegal profits.

Two motions to dismiss are pending, one filed by Gambro, and the other filed jointly by Dialysis Holdings and Transitional Hospitals.

1. The following is a brief summary of the complaint's allegations. Without a kidney transplant, a person suffering from End–Stage Renal Disease ("ESRD") requires kidney dialysis several times a week as well as regular testing and monitoring of her blood. Many elderly ESRD patients rely on Medicare to cover the cost of regular dialysis and necessary blood tests.

Different types of ESRD blood tests are reimbursed by Medicare in different ways. For example, there are "routine tests" which are performed on an ESRD patient's blood every time she undergoes dialysis. Reimbursement for these tests is rolled into the lump-sum "composite payment" that the Medicare beneficiary's dialysis provider receives from Medicare for regular dialysis services. Hence, routine tests cannot be billed separately to Medicare. Other tests, classified in the Medicare system as "allowable tests" and "nonroutine tests" and referred to hereafter as "nonroutine tests" for the sake of simplicity, are performed at less predictable intervals depending on the patient's particular needs. These tests, unlike routine tests,

---

1. The relator, Gareld J. Kneepkins, was a manager at the Smyrna Laboratory.

are billed to Medicare on a fee-for-service basis.

Certain blood tests may be performed simultaneously as a group, or "panel," on a given blood sample. Lab equipment developed during the 1980s allowed many routine and nonroutine tests to be performed together as a single panel. Thus, the marginal cost of performing additional nonroutine tests on a blood sample already slated for routine testing was greatly diminished. Questions arose as to whether a panel which included both routine and nonroutine tests could, either wholly or in part, be billed to Medicare.

In 1987, Health and Human Services published, in its "Medicare Carriers Manual," the so-called "50/50 Rule." Under the rule, direct reimbursement for any given panel would depend on the panel's ratio of routine to nonroutine tests. If half or more of the tests were routine, there would be no direct reimbursement; if less than half, the entire panel would be reimbursed. Furthermore, any request for reimbursement for nonroutine tests—which, per the 50/50 Rule, could only be made for panels that were predominantly nonroutine—was required to have an "ICD–9 Code" assuring that the tests were medically necessary.

Around that time in 1987, Community Psychiatric Centers Laboratories, Inc. ("CPC Labs"), a wholly-owned subsidiary of a major dialysis services provider, Community Psychiatric Centers, Inc. ("CPC"), struck a five-year partnership agreement with Clinical Laboratory Services, Inc. ("Damon CLS"), a wholly-owned subsidiary of Damon Clinical Laboratories, Inc. ("Damon"). They agreed to create and run a clinical testing laboratory operating under the name Damon Clinical Laboratories in Smyrna, Georgia (the "Smyrna Lab"). Damon and CPC, through their subsidiaries, split the Smyrna Lab profits evenly. In exchange for the Smyrna Lab's performance of routine tests for CPC for a

below-cost fee of $1 per test, CPC agreed to refer its nonroutine tests also to the Smyrna Lab, which then separately billed Medicare for those tests on a fee-for-service basis.

Damon and CPC initially planned to perform a monthly panel for each dialysis patient called the "Chem 19," consisting of roughly nineteen tests, seven of which were nonroutine and, prior to the announcement of the 50/50 Rule, would have been separately billable. The 50/50 Rule was announced while Damon and CPC were hammering out their agreement. It posed an immediate threat to the venture's ability to turn a profit. Damon and CPC decided, therefore, to split the Chem 19 panel in two. One new panel would be composed solely of routine tests (the "Chem 12"), the other solely of nonroutine tests (the "Chem 7"). The panels would be performed on separate days, and would require separate blood samples drawn from each patient. All of the tests in the split panels could have been, but were not, performed as a single panel. Indeed, for a different dialysis provider serviced by the Smyrna Lab during the same period of time, all the relevant tests were performed in single Chem 19 panels.

According to the government, running separate Chem 7 and Chem 12 panels on different days required extra blood samples drawn for each patient.[2] To assuage doubts and secure the needed ICD–9 codes, doctors were assured that the additional blood draws and split-panel procedures were necessary. They were not told that all of the tests could have been accomplished in a single panel, or that CPC's stake in the joint venture gave it an interest in maintaining the level of billable nonroutine Medicare tests. Nor was the Smyrna Lab's Medicare carrier informed, at that time or in later years, of the partnership agreement between Damon and CPC.

---

**2.** The defendants flatly deny that additional blood was ever drawn; for now, the government's allegations get the benefit of the doubt.

In 1988, Damon and CPC agreed to add several nonroutine tests to the battery of otherwise predominantly routine weekly and monthly tests that the doctors typically ordered. (For convenience, this will be referred to as the "Added Test Plan.") The added nonroutine tests were then separately billed to Medicare. Smyrna Lab technicians were told that these additional nonroutine tests were specifically ordered by CPC doctors and carried the imprimatur of CPC's consulting board of medical experts. The doctors were given forms which identified the newly added tests as routine; doctors who expressed misgivings were also told that CPC's board of experts had approved them. According to the complaint, none of these assurances was true. Non–CPC doctors who referred tests to the Smyrna Lab received different test-ordering forms which accurately segregated routine tests from nonroutine.

In 1989, CPC spun off its dialysis division to Vivra, Inc. ("Vivra"). Thereafter, CPC played a diminished role in the joint venture, taking a share of the profits from the Smyrna Lab until 1991. Through its Community Dialysis Centers, Inc. ("Vivra CDC") subsidiary, like CPC before it, Vivra agreed to refer most of its nonroutine tests to the Smyrna Lab in exchange for below-cost routine testing and a share of the Smyrna Lab's profits. Vivra also continued to support the split-panel procedure and the encouragement of unnecessary weekly and monthly nonroutine tests. Vivra referred tests to the Smyrna Lab under the terms of the agreement until the partnership was terminated in 1996.

None of the named defendants was directly involved in these events. Dialysis Holdings is a successor in interest to Vivra's dialysis units, an unincorporated division (Vivra Renal Care), and Vivra CDC. Gambro is Dialysis Holdings' parent corporation. Transitional Hospitals is successor in interest to CPC's dialysis business and CPC Labs.

These allegations must be accepted provisionally as true, and the government is entitled to any favorable inferences that may be drawn from them.

■ 2. The amended complaint hardly mentions Gambro at all; the only link between Gambro and the alleged wrongdoers is through Gambro's wholly-owned subsidiary, Dialysis Holdings. Arguing that this link is too slender to state a claim, Gambro has moved under Rule 12(b)(6) to dismiss the claims against it.

■ Ordinarily, the corporate form exists to limit liability. Ownership—even total ownership—of a corporation does not by itself impart the corporation's liabilities to the owner, and that rule is not abated simply because the owner happens to be another corporation. *See American Bell, Inc. v. Federation of Tel. Workers,* 736 F.2d 879, 886–87 (1984); *United Paperworkers Int'l Union v. T.P. Property Corp.,* 583 F.2d 33, 35–36 (1st Cir.1978). Under certain circumstances, however, the corporate veil may be pierced and an owner or parent may be held accountable for a corporation's liabilities.

■■ The Medicare program and the False Claims Act provide the basis for the government's claims; federal law, therefore, controls the veil-piercing question. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). "[F]ederal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules." *Id.* at 728, 99 S.Ct. 1448 (quoting *United States v. Yazell,* 382 U.S. 341, 354, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966)). The administration of Medicare and the enforcement of the False Claims Act are certainly such programs. A federal rule of decision is required. In an ERISA case, the First Circuit held that the veil may be pierced only if the parent and subsidiary lacked independence, the principals conducted their affairs with a requisite degree of "fraudulent intent," and failure to pierce the veil would work substantial injustice. *See United Elec.,*

*Radio and Machine Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1093 (1st Cir.1992). This three-factor test has been applied in other federal question cases, *see, e.g., Schaefer v. Cybergraphic Sys., Inc.,* 886 F.Supp. 921, 925 (D.Mass.1994) (employment discrimination), and shall be employed here.

Under any reasonable reading of the standard laid down in *Pleasant Street,* the government's pleadings with respect to Gambro do not suffice. The only fact alleged is Gambro's sole ownership of Dialysis Holdings. That alone is plainly not enough. The pleadings also state the conclusion—without divulging any factual basis—that Gambro is liable as a successor in interest, but this is the sort of "bald assertion," *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir.1990), that cannot pass muster. *See Resolution Trust Corp. v. Driscoll,* 985 F.2d 44, 48 (1st Cir.1993) (naked assertion of alter ego status, without allegation of facts to undergird it, states no claim against the parent corporation).

The government opposes Gambro's dismissal, noting that federal courts disregard the corporate form in the interests of "public convenience, fairness and equity," and that the corporate form garners less respect in matters involving the enforcement of federal statutes. *See Town of Brookline v. Gorsuch,* 667 F.2d 215, 221 (1st Cir.1981). *Gorsuch* is of little help. First, the pleadings do not provide any reason to suspect that "public convenience, fairness, and equity" would be threatened by releasing Gambro from the case. Gambro is not said to have filed a false claim itself. Nor does any allegation suggest that Gambro, dreading a future day of reckoning in this case, has stripped Dialysis Holdings of assets. Second, *Gorsuch* explored a far different question from the one posed here. In that case, the court was asked to consider whether the Environmental Protection Agency ("EPA") had improperly extended an exemption from pollution regulations to a subsidiary of Harvard University that operated a power plant servicing Harvard's medical school and several nearby teaching hospitals. Harvard's subsidiary applied for the exemption, which could only be granted if the applicant was an educational institution. The EPA, looking beyond the corporate distinction between the subsidiary—which simply ran the plant and conducted no educational activity—and Harvard, accorded the benefit of Harvard's status as an educational institution to the subsidiary. The court endorsed the EPA's sensible decision. *See Gorsuch,* 667 F.2d at 221. *Gorsuch,* therefore, concerned whether it was appropriate to ignore the corporate form in order to confer a regulatory benefit, not whether it was appropriate to pierce the corporate veil to impose liability.

■ The government makes a more plausible argument that Gambro, a privately-held corporation whose affairs are not open to scrutiny, must be kept in the case because the information concerning its relationship with Dialysis Holdings and Vivra is within its control, unavailable to the government for pleading purposes, and may only be unearthed through discovery. Even so, the government must still allege, if only on information and belief, the facts it asserts would provide the basis for Gambro's liability. And allegations which sound in fraud—which, under *Pleasant Street,* would include the requisite allegations of fraudulent intent—must provide, if pled on information and belief, "the source of the information and the reasons for the belief." *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991). Here, the only fact alleged, on information, belief, or otherwise, is Gambro's ownership of Dialysis Holdings. That is not enough.

■ The government also argues that veil-piercing analysis may not apply here at all because Gambro may be liable as a successor in interest to Vivra's dialysis business. *See Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 180, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). But Gambro apparently did not directly purchase assets or business interests from Vivra. Gambro

only owns Dialysis Holdings, which, from all that appears, is the entity that purchased the business from Vivra. This is a garden-variety acquisition strategy. The reason for using the subsidiary as the "purchase vehicle" may be to limit the parent's liability, but that is a legitimate practice absent concrete allegations of abuse of the corporate form, which are lacking here.

■ Finally, the government argues that the pleadings, bare though they may be, are sufficient to put Gambro on notice of the claims that might conceivably evolve against it. Even under the liberal norms of notice pleading, overlooking the stricter requirements of Rule 9(b), a pleader may not require a defendant to guess at what the contours of the claims against it may be when they take shape at some uncertain future time.

Gambro's motion to dismiss is GRANTED.

3. Services billed to Medicare must be reasonable and medically necessary, 42 U.S.C. § 1395y(a)(1)(A) and they must be "provided economically,". § 1320c–5(a)(1). The government alleges that the Chem 7 panel tests and many of the nonroutine tests added to routine panels after 1988 were performed in violation of these statutes, and that claims submitted for those tests were fraudulent. Also, the Anti-Kickback Law prohibits the offer or solicitation of remuneration (including kickbacks and rebates) in exchange for referrals of Medicare-payable services. § 1320a–7b(b)(1)(A). The government contends that the Smyrna Lab partnership agreement, providing for below-cost routine testing and profit sharing in exchange for nonroutine test referrals, violated the Anti-Kickback Law, and that claims submitted for payment for tests run pursuant

to this agreement necessarily were false or fraudulent.

In their papers, Transitional Hospitals and Dialysis Holdings argue that splitting the Chem 19 panel into two separate Chem 12 and Chem 7 panels was legitimate, that the government's allegations of unnecessary testing are barred by estoppel and not pled with the particularity that Rule 9(b) requires, that even if the partnership agreement concerning the Smyrna Lab violated the Medicare Anti-Kickback Law, 42 U.S.C. § 1320a–7(b), it did not violate the False Claims Act, and that the government's common law claims, in addition to being inadequately pled, are barred by the applicable statute of limitations.

■ With regard to panel splitting, the defendants point out that no statute or regulation specifically prohibits the practice.[3] According to the parties, the Chem 7 claims submitted by the Smyrna Lab stated that the "services [provided] were medically indicated and necessary for the health of the patient. . . ." The government has not pled that all, or any, of the tests reflected in these claims were themselves medically unnecessary. It instead argues that the Chem 7 panels, which required the drawing of an additional blood sample from each patient every month, were unnecessary since all of the needed blood tests, as the Smyrna Lab's partners knew, could have been performed at one time for no additional cost using a single blood sample for a Chem 19 panel.

The defendants labor to disconnect the presumed medical necessity of the tests performed in each Chem 7 panel from the dubious necessity of the additional blood draw which the Chem 7 panels allegedly required. The argument is unconvincing. When a provider certifies that a test is

3. Though the defendants argue that it is an improperly promulgated substantive rule, plainly the 50/50 Rule is an interpretive rule that clarifies the preexisting regulatory conditions for reimbursement of panel tests. *See Warder v. Shalala,* 149 F.3d 73, 79 (1st Cir. 1998). That said, interpretive rules such as the $^{50}/_{50}$ Rule, by their nature, do not impose affirmative duties upon providers. Hence, the 50/50 Rule does not command providers to structure their tests in any particular manner, and, despite the government's contrary suggestion, measures taken to avoid the application of the Rule are not necessarily illegitimate.

medically necessary, it also certifies that any procedures which the provider knows are required in order to perform the test are themselves, within reason, medically necessary as well. The Smyrna Lab partners knew, according to the complaint, that restricting nonroutine tests to the Chem 7 panel, compared to running them as part of equally-feasible Chem 19 panels, would provide no medical or economic benefit (other than to the Lab's bottom line) and would subject sick patients to needless and intrusive withdrawal of additional blood, with the attendant (albeit incremental) medical risks.

The defendants argue that these allegations will prove false, but their truth or falsity cannot be tested at this time. For now, they are sufficient. To certify the medical necessity of such tests (or cause such tests to be certified), knowing that the tests necessarily entailed procedures which were deleterious, inferior, and pursued solely for profit, is to submit a false or fraudulent claim. That is what the complaint alleges, and it is sufficient under the standard of Rule 12(b)(6).

■ The government also argues that each claim submitted for Chem 7 tests ran afoul of 42 U.S.C. § 1320c–5(a)(1), which requires, among other things, that Medicare-reimbursable health care services not only be medically necessary but also "economically" provided. The defendants contend that § 1320c–5 could not possibly apply to ESRD facilities such as the Smyrna Lab, although the statute's plain language ("any ... health care facility ... [that] provides health care services" payable under the Social Security Act, which includes Medicare) suggests otherwise.

More troubling, however, is the fact that the Chem 7 claims contain no express certification that the tests were economically provided. The government's theory depends, therefore, on the proposition that every Chem 7 claim the Smyrna Lab partners submitted contained an implied representation that the tests had been conducted in compliance with § 1320c–5's economical care requirement, that the

tests were not economically conducted, and that, had the government known this, it would have refused to pay those claims. In *Ab–Tech. Constr., Inc. v. United States,* 31 Fed.Cl. 429, 434 (Fed.Cl.1994), the implied certification case principally relied upon by the government, the relevant set-aside statute authorized procurement contracts only with qualifying minority-owned small businesses; the defendant contractor pretended to be one but, in fact, was not. While the claims that the contractor submitted did not expressly state that it had complied with the set-aside statute's eligibility requirements, the court held that the contractor had deceived the government concerning a fact so central to the set-aside program that the claims, lack of express certification notwithstanding, were inherently fraudulent.

Apparently, no case has yet extended this principle to claims that supposedly violate § 1320c–5's economical care requirement. *United States ex rel. Aranda v. Community Psychiatric Ctrs.,* 945 F.Supp. 1485, 1488 (W.D.Okla.1996) relied in part upon § 1320c–5 while denying a motion to dismiss, although the extent of the court's reliance on that section is unclear since it was cited in parallel with nearly identical statutory language found in 42 U.S.C. § 1320a–7(b)(6)(B). *United States ex rel. Mikes v. Straus,* 84 F.Supp.2d 427, 436 (S.D.N.Y.1999), on the other hand, allowed defendants' motion for summary judgment because the record evidence did not show that reimbursement of defendants' spirometry tests was conditioned upon compliance with § 1320c–5(a). In both *Aranda* and *Mikes,* the requirement at issue was § 1320c–5's command that care be provided "of a quality which meets professionally recognized standards," not the economical care requirement which is at issue here.

The facts alleged in the complaint place this case in decidedly different terrain than cases such as *Mikes,* or, for example, *Luckey v. Baxter Healthcare Corp.,* 183

F.3d 730, 733 (7th Cir.1999) (availability of a more stringent blood plasma testing protocol did not render test certifications false or fraudulent). Here, the panel-splitting decision was not made to reduce the cost of testing, improve the accuracy of the tests, or balance competing tradeoffs that may exist between these goals. Panel-splitting did not make the tests that were performed more accurate or reliable. Nor did it reduce costs; in fact, by requiring two panels to be run for every patient where one Chem 19 panel would have sufficed, the panel-splitting procedure may well have increased the cost of testing. *Compare Luckey*, 183 F.3d at 732 (test protocol reflecting rational cost-benefit analysis insulated from False Claims Act liability). Panel-splitting, it seems, was utilized solely to increase the Medicare payout, and the government asserts, with some force, that it would not have reimbursed these tests had it known about the panel-splitting procedure.

For this reason, the tax avoidance cases cited by the defendants are inapposite. They simply reinforce the axiom that the government cannot make a person pay a tax she does not owe, regardless of whether she purposefully avoided the behavior that would have produced the tax liability in question. Indeed, the tax codes are filled with examples of taxes intended precisely to get people to avoid them, thus discouraging certain unwanted activities (such as excessive smoking or the early withdrawal of retirement savings). Claims made upon the government for payment are different. The government can refuse to pay a claim to which the claimant is not entitled. Submitting a claim under the false pretense of entitlement is fraudulent. Here, the entitlement to Medicare reimbursement depends upon fulfilling an obligation to perform services economically, *see* 1320c–5(a)(1), and the Smyrna Lab partners are accused of surreptitiously performing those services in an intentionally wasteful manner. The government may proceed on this theory.

For essentially the same reasons, I conclude that the alleged violations of the Anti–Kickback Law related to the Smyrna Lab partnership agreement—particularly, the allegation that below-cost routine testing, i.e. a rebate on services, was offered and accepted in exchange for nonroutine test referrals—are also sufficient to state a claim under the False Claims Act. *See United States ex rel. Pogue v. American Healthcorp. Inc.*, 914 F.Supp. 1507, 1513 (M.D.Tenn.1996) (concealment of alleged kickback agreement sufficient to state claim for fraud under implied certification theory). The position is not uncontroversial, *see United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1048 n. 33 (S.D.Tex.1998) (referring to the implied certification theory as *Pogue*'s "Achilles heel"); Lisa Michelle Phelps, Note, *Calling Off the Bounty Hunters: Discrediting the Use of Alleged Anti– Kickback Violations to Support Civil False Claims Actions*, 51 Vand.L.Rev. 1003 (1998), and cases following *Pogue* have generally involved some evidence, lacking here, of express certification of compliance with applicable law. *See, e.g., Gublo v. NovaCare, Inc.*, 62 F.Supp.2d 347, 355 (D.Mass.1999) (annual reports included certifications); *Thompson*, 20 F.Supp.2d at 1048 (same). Yet the government has adequately alleged that the Smyrna Lab partners' agreement violated the Anti–Kickback Law and was intentionally concealed in order to deceive the government into making payments it otherwise would have withheld. That the omitted material fact in this circumstance was the existence of an illegal kickback agreement does not change the pleading standard otherwise applicable to this variant of fraud, *see Luckey*, 183 F.3d at 732 (discussing fraud by omission), and under that standard these pleadings are satisfactory.

The government also alleges that some of the nonroutine test claims submitted under the Added Test Plan regime were false. The defendants' response is

two-fold. First, they note that a 1986 report issued by a National Institute of Health ("NIH")[4] advisory board stated that conducting some of those added tests—monthly ferritin and magnesium tests as well as thrice-weekly calcium and potassium tests—was "optimal" laboratory practice. Hence, the defendants say, the government must be estopped from seeking to impose liability for following a testing regimen that its own agents apparently recommended.

▪ The cases cited by the defendants make plain that the government may be estopped in a limited vein of circumstances. In the archetypal case, an agent of the government renders specific advice which is reasonably relied upon and which encourages the very conduct that later lands the unwitting defendant in the dock. Even then, estoppel is only applied against the government to avoid manifest injustice. *See, e.g., United States v. Lazy FC Ranch*, 481 F.2d 985, 989–90 (9th Cir.1973) (agent gave incorrect advice regarding payment limitations for soil bank program, upon which land partnership relied; government later estopped from collecting monies in excess of limitation that were paid to the partnership for keeping its land idle); *United States v. Fox Lake State Bank*, 366 F.2d 962, 965–66 (7th Cir.1966) (government estopped from bringing False Claims Act suit because agent had encouraged the filing of the false claim in order to precipitate administrative ruling necessary to determine the availability of deposit insurance).

Such is not the case here. Both sides appear to agree that the NIH advisory board's recommendation carried no regulatory weight. Although the recommendation may later prove to be competent evidence of the medical necessity of these tests, the defendants have not alleged that

they were specifically instructed by anyone to run their tests according to the recommendation's prescriptions; they have not even alleged that the recommendation was something upon which they relied. And, if they did so rely, for the reasons explained above, such reliance would not appear to have been reasonable.

Still, the defendants insist, it is "unjust" for the government to call the regimen "optimal" yet punish those who implement it. Yet one might imagine government advisory boards of various stripes floating "optimal" policy recommendations that, say, call for the decriminalization of marijuana or the lowering of various marginal tax rates or the deregulation of certain aspects of hazardous waste disposal. If such statements were later construed to bind the government, a mere trial balloon could undo statutes and regulations in force. Worse still, the public discussion of embryonic policy adjustments by government entities, an obviously salutary phenomenon, would be severely discouraged. The government, therefore, shall not be estopped.

The defendants also assert that the government's allegations concerning the Added Test Plan are insufficiently pled under Rule 9(b).[5] On this subject, the defendants have a point. In the complaint, the government did not identify specifically which claims for nonroutine tests were unnecessary. As of its last filing, the government represented that it would provide the defendants with a refined computerized list specifically identifying every claim alleged to contain unnecessary testing. The provision of such a list would satisfy the Rule, to the extent that it provides the necessary details of the time, place, and content of each allegedly false claim. *See Greebel v. FTP Software, Inc.*, 194 F.3d

---

4. The NIH is a component of the Department of Health and Human Services, which administers the Medicare program.

5. Roughly the same argument is made concerning the previously-discussed panel-splitting allegations. Since, under the govern-

ment's theory, every Chem 7 claim submitted was inherently fraudulent, and since the government has represented that it has provided the defendants with a computerized list of all of the Chem 7 claims, the objection is not persuasive as to the Chem 7 claims.

185, 193 (1st Cir.1999) (describing applicable test under the Rule). I note, however, that a list which simply regurgitated all the claims that *might contain* unnecessary tests, without specifically identifying which claims and which tests were said to be unnecessary, would not satisfy the Rule. That is because the complaint is of little help in winnowing the field: it asserts only that, after the practice of adding nonroutine tests was discontinued, requests by CPC (and later, Vivra) doctors for such tests declined dramatically. This trend may be probative evidence that unnecessary tests were ordered before the practice was discontinued, but the Rule requires greater specificity than statistical analysis. *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997) (statistical studies showing that 40 percent of claims were for unnecessary tests insufficient to meet Rule 9(b)).

Because the conspiracy count under § 3729(a)(3) appears to rely upon the fraudulence *vel non* of the panel-splitting and unnecessary testing allegations, it also survives the dismissal stage.

Finally, the defendants argue that the allegations do not support the common law counts, and that the applicable statute of limitations would bar them anyway. I reject these arguments largely for the reasons put forward in the government's brief, and observe that the facts alleged in the complaint are sufficient to toll the statute of limitations. *See* 28 U.S.C. § 2416.

Accordingly, the motion of Transitional Hospitals Corporation, Inc. and Dialysis Holdings, Inc. to dismiss is DENIED.

SO ORDERED.