CORRIGAN, J.,
Concurring and Dissenting.—I agree with the majority that Civil Code section 2527 (hereafter section 2527, the statute, or the provision) implicates the right of free speech under article I, section 2, subdivision (a) of our state Constitution (article I), which provides: “Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.” As we explained in Gerawan Farming, Inc. v. Lyons (2000) 24 Cal.4th 468 [101 Cal.Rptr.2d 470, 12 P.3d 720] (Gerawan I), “the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say.” (Id. at p. 491.) In light of the history and broad language of article I, “[t]he reference to ‘all subjects’ obviously included commercial speech . . . .” (Gerawan Farming, Inc. v. Kawamura (2004) 33 Cal.4th 1, 15 [14 Cal.Rptr.3d 14, 90 P.3d 1179] (Gerawan II).) Even in the First Amendment context, the United States Supreme Court has held “that the creation and dissemination of information are speech” within the meaning of that provision. (Sorrell v. IMS Health Inc. (2011) 564 U.S._ [131 S.Ct. 2653, 2667, 180 L.Ed.2d 544].) Under our precedent, forcing someone to speak implicates the free speech right under article I, even in a commercial context. By compelling preparation and dissemination of a report about pricing, the statute implicates the state constitutional right not to speak under compulsion.
My disagreement with the majority concerns the appropriate standard of review, which is more than simply a dry legal formalism. When the government seeks to prohibit or compel speech, the standard of review is an important safeguard. It requires the government to justify, to varying degrees of rigor, why it should be permitted to do so. In my view, the majority sets the bar for this safeguard too low. There are, broadly, three potential standards: strict scrutiny, intermediate scrutiny, and, least protective, a rational basis justification.
*369 Although recognizing that our state free speech right is implicated, the majority selects a rational basis standard of review. But that standard is generally applicable when a statute does not implicate free speech. The majority reasons: “Laws requiring a commercial speaker to make purely factual disclosures related to its business affairs, whether to prevent deception or simply to promote informational transparency, have a ‘purpose . . . consistent with the reasons for according constitutional protection to commercial speech.’ [Citation.] Because such laws facilitate rather than impede the ‘free flow of commercial information’ [citation], they do not warrant intermediate scrutiny.” (Maj. opn., ante, at p. 356, italics added.) This reasoning is flawed. It is also inconsistent with the history of article I and our cases construing that provision.
At the outset, it is important to be clear as to our task. We are interpreting a provision of the California Constitution that has governed free speech in this state since its inception. We are not bound, in this regard, by United States Supreme Court or lower federal court rulings that interpret the federal constitutional provision. In deciding this case, we are adopting as a matter of California law and policy the restrictions to be placed on the government when it seeks to control how its citizens speak or remain silent during the conduct of their own affairs.
Initially, the majority cites no California case applying rational basis review to a law implicating free speech under our Constitution. It relies instead on various federal authorities. However, in determining the proper standard of review, we must first examine our Gerawan cases, which addressed both the protections afforded commercial speech and the relevant standard of review. There, we considered the constitutionality of a government marketing program that required plum growers to fund generic advertising for plums. We acknowledged in Gerawan I that the United States Supreme Court in Glickman v. Wileman Brothers & Elliott, Inc. (1997) 521 U.S. 457 [138 L.Ed.2d 585, 117 S.Ct. 2130] had held that a similar program did not implicate the First Amendment’s free speech clause. However, we declined to follow Glickman’s reasoning in construing our own state’s protection of free speech. We initially observed that article I’s free speech clause did not derive from the First Amendment and is generally broader than that provision. (Gerawan I, supra, 24 Cal.4th at pp. 489-493; Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 366, fn. 9 [93 Cal.Rptr.2d 1, 993 P.2d 334].)
Gerawan I explained that the state free speech provision, from its inception, protected commercial speech, many decades before the United States Supreme Court recognized any commercial speech right in the First Amendment. This was due both to the breadth of its language, providing a right to *370 speak freely “on all subjects,” and the history of its origins. (Art. I.) Gerawan I observed that, at the time of the founding of our state, both American legislatures and courts had a history of keeping commercial speech free of regulation, except in cases of unlawful activity or to curb fraud or misleading statements. (Gerawan I, supra, 24 Cal.4th at p. 494.) Gerawan I described this period in our history: “In California itself in 1849, the prevailing political, legal, and social culture was that of Jacksonian democracy. [Citations.] Jacksonian democracy was animated by ‘ideals of equality and open opportunity.’ [Citation.] Those ideals worked themselves out in a ‘liberal, market-oriented, economic individualism.’ [Citation.] What such individualism presupposed, and produced, was wide and unrestrained speech about economic matters generally, including, obviously, commercial affairs.” (Id. at p. 495.)
Protection of economic speech is not absolute. “[A]rticle I’s right to freedom of speech allows compelling one who engages in commercial speech to say through advertising what he otherwise would not say, even about a lawful product or service, in order to render his message truthful and not misleading.” (Gerawan I, supra, 24 Cal.4th at p. 509.) However, Gerawan I concluded that the marketing program at issue compelled funding of “generic advertising that is intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare.” (Id. at p. 510.) We remanded the matter to the Court of Appeal, leaving undetermined the proper standard of review. (Id. at p. 517.)
We addressed that issue in Gerawan II and concluded the proper standard was “the intermediate scrutiny standard articulated by the United States Supreme Court in Central Hudson Gas & Elec. v. Public Serv. Comm’n [(1980)] 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343].” (Gerawan II, supra, 33 Cal.4th at p. 6.) We observed that “[i]n light of our recognition in Gerawan I that the generic advertising program does in fact implicate the free speech clause,... we believe it would be incongruous to subject the program to only minimal scrutiny.” (Id. at p. 21.) Finding persuasive Justice Souter’s dissenting opinion in Glickman, we stated, “the conclusion of the Glickman majority that the compelled funding of generic advertising requires only minimal scrutiny is at variance with the general rule that intrusion into free speech rights requires substantial justification, even when the intrusion is incidental to the enforcement of a content-neutral law. [Citation.] The requirement of substantial justification is further supported by the fact that the right to free speech under the California Constitution is in some respects ‘ “broader” and “greater” ’ than under the First Amendment. [(Citation to Gerawan I)].” *371 (Ibid.) “Because generic advertising was not self-evidently incidental to the functioning of some important, legislatively established institution, such as a union shop or an integrated state bar as in Abood [v. Detroit Board of Education (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782]] and Keller [v. State Bar of California (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228]], Justice Souter argued for treating compelled funding of such advertising the same as any other regulation implicating the right of commercial speech, subjecting it to the test articulated in Central Hudson .... That standard asks (1) ‘whether the expression is protected by the First Amendment,’ which means that the expression ‘at least must concern lawful activity and not be misleading’; (2) ‘whether the asserted governmental interest is substantial’; if yes to both, then (3) ‘whether the regulation directly advances the governmental interest asserted’; and (4) ‘whether it is not more extensive than is necessary to serve that interest.’ ” (Id. at p. 22.) Gerawan II also noted that “the right Gerawan seeks to exercise has nothing to do with untruthful or misleading speech on its part.” (Ibid.)
The majority’s application of the rational basis standard is inconsistent with the language and history of article I’s free speech provision. The language of our constitutional provision is broader than the First Amendment, and it originated during a period in our history when legislatures and courts alike did not interfere with commercial speech, save to correct fraud or misleading statements. As Gerawan I observed, our Constitution has a history of protecting commercial speech that long predated its federal counterpart. We observed in Gerawan II that if we find a statute implicates the right of free commercial speech, in light of the broad language of our constitutional provision and its strong history of protecting commercial speech, it would be “incongruous” to apply “only minimal scrutiny.” (Gerawan II, supra, 33 Cal.4th at p. 21.)
The reasoning of the Gerawan cases cannot simply be distinguished away on their facts. Although the present case involves the compulsion to speak rather than the compulsion to fund speech, Gerawan I made no distinction between the two. (See Gerawan I, supra, 24 Cal.4th at p. 491.) Indeed, the funding of speech was objectionable there because it implicated the right not to speak. (Id. at p. 514 [“One does not speak freely when one is restrained from speaking. But neither does one speak freely when one is compelled to speak.”].) That is precisely the right implicated here, as the majority acknowledges. (See maj. opn., ante, at pp. 340-345.)
Because free speech is implicated, Gerawan II teaches that the applicable standard is intermediate scrutiny. In formulating the proper test for intermediate scrutiny under our constitution, Gerawan II concluded the test of Central Hudson Gas & Elec. v. Public Serv. Comm’n, supra, 447 U.S. 557 (Central *372 Hudson), “appropriately protects the free speech rights article I was designed to safeguard” in the commercial speech context, which “neither warrants application of the strictest scrutiny reserved for such matters as the censorship or compelled utterance of noncommercial speech [citations], nor can it pass muster simply because it is rationally based.” (Gerawan II, supra, 33 Cal.4th at p. 22.) Thus, rather than create a new formulation, we adopted the test articulated in Central Hudson because it was a workable standard that adequately protected the right of free commercial speech under article I’s free speech provision.
The Gerawan cases noted some narrow exceptions to this rule, but none apply here. As the majority acknowledges (see maj. opn., ante, at p. 356), section 2527 does not compel speech for the purpose of correcting false or misleading statements. (See Gerawan II, supra, 33 Cal.4th at p. 22.) Gerawan I observed, if “the commercial speaker’s message is already truthful and nonmisleading, however, compulsion of speech is not supported by the consumer protection rationale, but must be supported, if at all, by some rationale applicable to all speech, noncommercial as well as commercial.” (Gerawan I, supra, 24 Cal.4th at p. 498.)
No such general rationale exists here. Section 2527 is “not self-evidently incidental to the functioning of some important, legislatively established institution, such as a union shop or an integrated state bar . . . .” (Gerawan II, supra, 33 Cal.4th at p. 22.) In the First Amendment context, the United States Supreme Court in United States v. United Foods, Inc. (2001) 533 U.S. 405 [150 L.Ed.2d 438, 121 S.Ct. 2334] (United Foods), distinguished its decision in Glickman. United Foods noted the marketing program in Glickman was part of a greater statutory scheme that “used marketing orders that to a large extent deprived producers of their ability to compete and replaced competition with a regime of cooperation. The mandated cooperation was judged by Congress to be necessary to maintain a stable market. Given that producers were bound together in the common venture, the imposition upon their First Amendment rights caused by using compelled contributions for germane advertising was, as in Abood and Keller, in furtherance of an otherwise legitimate program.” (United Foods, at pp. 414—415.) By contrast, United Foods concluded the assessment there was not part of a “ ‘broader regulatory system’ ” and “[w]e have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself.” (Id. at p. 415.)
There is no question here that section 2527 is not part of a greater regulatory scheme. It is a stand-alone statute enacted, as the majority *373 acknowledges, only because the Legislature could not pass a bill directly regulating pharmacy reimbursement rates. (See maj. opn., ante, at pp. 337-339.) Thus, the provision’s only purpose is directed at speech, to compel speech in the particular context of a contractual relationship between prescription drug claims processors and third party payers.
The majority suggests another exception to the application of intermediate scrutiny with respect to a statute compelling speech; the promotion of “informational transparency.” (Maj. opn., ante, at p. 356.) But no such exception exists. Even assuming the federal cases cited by the majority are relevant here, they do not support this exception. The majority quotes 44 Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484 [134 L.Ed.2d 711, 116 S.Ct. 1495], which stated: “When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review.” (Id. at p. 501, italics added; see maj. opn., ante, at p. 356.) The majority reads too much into the italicized language. 44 Liquormart had nothing to do with any type of disclosure, involving instead a complete ban on price advertising of alcohol. The plurality cited other recognized exceptions to the application of intermediate scrutiny, including regulation designed to curb “misleading, deceptive, or aggressive sales practices.” (44 Liquormart, at p. 501.) Thus, its reference to the “disclosure of beneficial consumer information” (ibid.) must also have been a reference to an established exception to the ordinary intermediate scrutiny standard, namely, consumer protection. However, that established exception is not as broad as this statement would suggest.
The examples cited by the majority bear this out. The five lower federal court cases discussed by the majority (see maj. opn., ante, at pp. 356-360) purported to apply Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626 [85 L.Ed.2d 652, 105 S.Ct. 2265] (Zauderer). That case involved an attorney disciplinary rule requiring that “any advertisement that mentions contingent-fee rates must ‘disclos[e] whether percentages are computed before or after deduction of court costs and expenses’ . . . .” (Id. at p. 633.) In applying rational basis review rather than intermediate scrutiny, Zauderer reasoned: “The State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available. Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, [citation] appellant’s constitutionally protected interest in not providing any particular factual information in his advertising *374 is minimal. Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech, ‘waming[s] or disclaimers] might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception.’ [Citations.]” (Id. at p. 651, italics added & omitted.)
Under Zauderer, the principal rationales for applying a lower standard of review for compelled commercial speech are that speakers had no compelling right to refrain from disclosing accurate information about their goods or services, and such disclosures aided consumers by forestalling misleading or fraudulent statements. Indeed, Zauderer held “that an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” (Zauderer, supra, 471 U.S. at p. 651, italics added.) Thus, Zauderer did not contemplate that all disclosures of factual information should be subject to the lowest standard of review, but only those principally designed to protect consumers.
Contrary to the majority’s reasoning, section 2527 is not a disclosure statute warranting application of the Zauderer rationale. As described by the dissenting opinion in the Ninth Circuit’s panel decision, the provision is “an unusual law without clear analogies in existing precedent. . . . Essentially, it requires Business A to speak about Business B to Business C. Unlike a disclosure law, it does not require that regulated entities divulge information about themselves to the public, but rather that they privately produce information about third parties to their clients. [Citation.] Moreover, § 2527 is a stand-alone law that does nothing more than mandate speech. It is not ancillary to any comprehensive economic regulatory scheme. [Citation.]” (Beeman v. Anthem Prescription Management (9th Cir. 2011) 652 F.3d 1085, 1108 (dis. opn. of Wardlaw, J.), judg. vacated (9th Cir. 2011) 661 F.3d 1199.)
Nothing in the language or spirit of Zauderer justifies deviating from intermediate scrutiny as required by Gerawan II. Section 2527 does not require a disclosure intended to prevent misleading or fraudulent speech.[1] *375 Nor does it require a disclosure aimed at consumer protection or public health.* [2] Further distinguishing it from a traditional consumer disclosure statute, the provision does not require information about the entity compelled to speak or about the underlying transaction at issue. The statute compels prescription drug claims processors to compile data concerning prices charged by unrelated third parties in transactions involving uninsured patients at retail. These transactions have nothing to do with insurance claims or reimbursements. Indeed, the sole purpose of requiring the transmittal of this data is to “persuade insurers to increase their reimbursement rates to pharmacies to more closely match the private-pay fees.” (ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc. (2006) 138 Cal.App.4th 1307, 1320 [42 Cal.Rptr.3d 256] (ARP Pharmacy Services).)
The majority’s attempt to analogize section 2527 to various consumer disclosure statutes is not sustainable. At their core, ordinary disclosure laws are intended to level the playing field between economic actors of uneven strength. These disclosure laws usually require businesses to provide pertinent information to consumers, information about the businesses or their products that are readily and easily ascertained by the businesses themselves but would be prohibitively difficult for consumers to obtain on their own. These disclosures give consumers information that illuminates and clarifies the nature of the transactions they face, i.e., they attempt to tell consumers what they are getting themselves into before they do so. Armed with this type of information, consumers are placed in a position closer to equal footing with those businesses.
Rather than leveling the scale, section 2527 serves to tip the scale in one direction. The statute is not intended to make two unequal actors more equal, but rather is intended to affect the outcome of negotiations between two equal actors. There is no doubt that the parties affected by the provision, prescription drug claims processors and payers, are sophisticated business entities. If insurance companies deemed information regarding retail drug pricing *376 relevant to their business, they could easily contract to secure that information from prescription drug claims processors. Whether one large, sophisticated corporate entity provides such information to a similarly sophisticated entity within the context of a private agreement should be a matter left to negotiation between them, just like any other provision of a contract between corporations. Section 2527 requires one party to the contract to engage in speech for the sole purpose of potentially modifying a term of a privately negotiated contract. This imposition serves no leveling function and has absolutely nothing to do with protecting consumers or providing the public with relevant information. It is an attempt by the government to put its thumb on the scale, with the goal of achieving indirectly what it could not accomplish directly. Simply put, the government has taken sides, resorting to compelled speech to promote its vision of what this private contract should look like. Such a purpose hardly warrants deviating from the historical protection of commercial speech as embodied in article I and articulated in our Gerawan decisions.
The majority seeks to bolster its position by asserting that section 2527 has a “public purpose,” noting that increased reimbursement rates might increase pharmacy participation, thus providing consumers more choice. (Maj. opn., ante, at p. 362; see ARP Pharmacy Services, supra, 138 Cal.App.4th at p. 1320.) One would hope that when the Legislature passes any law it does so with appropriate public regard. Simply because a provision has some kind of perceived public interest does not transform it into a consumer or public protection statute justifying a lower standard of review under Zauderer. The Legislature may determine that having higher reimbursement rates would ultimately benefit the public. The Legislature may pass any number of laws to this end, including directly regulating reimbursement rates. But the Legislature’s preference, by itself, does not justify intrusion into protected speech rights. For example, the government’s stance against prostitution, while supporting the passage of criminal laws prohibiting prostitution,[3] does not justify conditioning government funding upon adopting a policy against prostitution. (See Agency for Int’l Development v. Alliance for Open Society Int'l, Inc. (2013) 570 U.S. _ [186 L.Ed.2d 398, 133 S.Ct. 2321, 2327-2332].) The government’s stance against smoking, while supporting increased taxes on cigarettes or a ban on cigarette smoking in certain public places,[4] does not justify compelled speech in the form of graphic images intended to further “an ongoing effort to discourage consumers from buying” *377 cigarettes. (R.J. Reynolds Tobacco Co. v. Food and Drug Administration (D.C. Cir. 2012) 402 U.S. App.D.C. 438 [696 F.3d 1205, 1216] (R.J. Reynolds) [applying intermediate scrutiny].) In short, a public purpose that may justify a general law not implicating speech does not necessarily fall within the narrow Zauderer rationale justifying a lower standard of review with respect to a law that does implicate speech. Indeed, any other conclusion would all but eviscerate the commercial speech protections of article I.
The majority suggests that applying intermediate scrutiny here would “mak[e] the free speech clause into a warrant for courts to superintend the Legislature’s economic policy judgments.” (Maj. opn., ante, at p. 360.) Not so. Section 2527 is a unique and unprecedented statute. It is nothing like any other disclosure statute and does not serve the leveling function usually provided by such statutes. It does not require a disclosure to prevent consumer confusion or fraud, further public health or safety, or inform the public about a particular transaction or entity. Nor is it part of a comprehensive regulatory scheme; it is a single statute directed only at speech, in one industry, designed to influence contractual bargaining between sophisticated business entities. The statute involves none of the factors previously cited to warrant a lesser standard of review. The majority fails to explain how application of the intermediate scrutiny standard of Gerawan II under such circumstances would call into question the legitimacy of any other true disclosure statute. Contrary to the majority’s reasoning, judicial restraint counsels against deviating from our precedents by applying a lesser and unwarranted standard of review.
The majority asserts that section 2527 does not “reflect paternalism toward participants in the marketplace” (maj. opn., ante, at p. 354), but merely requires prescription drug claims processors to provide objective information with which “they do not identify any disagreement” (maj. opn., ante, at p. 349). The latter assertion is somewhat misleading. Prescription drug claims processors may have no quarrel regarding the accuracy of the data required to be reported. However, they vehemently disagree that this data is at all relevant in determining proper reimbursement rates and that they can be forced to compile and disseminate it. The statute’s requirement reflects the government’s conclusion that such information is relevant in setting reimbursement rates and should be considered, even when these contractual *378 entities have not seen fit to compile and consider such information on their own. Concluding that the government knows better than sophisticated actors in the marketplace as to how best they might protect their own interests is paternalism writ large.
Applying the Central Hudson standard to our constitutional free speech provision, intermediate scrutiny review asks: (1) Is the speech protected under article I? (2) Is the asserted governmental interest substantial? If one gives affirmative answers to these questions, then: (3) Does the law directly advance the asserted governmental interest? (4) Is it more extensive than required to serve that interest? (Gerawan II, supra, 33 Cal.4th at p. 22; Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 952 [119 Cal.Rptr.2d 296, 45 P.3d 243]; see Central Hudson, supra, 447 U.S. at p. 566.)
Section 2527 fails this test. With respect to the first prong, the statute involves protected speech, as the majority agrees.
Whether the asserted governmental interest supporting the provision is substantial may be debated. As noted, “[t]he theory was that if insurers paid the pharmacies dispensing fees closer to the amount paid by uninsured consumers, pharmacies would be more likely to continue to contract with insurers, and insured consumers would be able to have their prescriptions filled at the pharmacies of their choice.” (ARP Pharmacy Services, supra, 138 Cal.App.4th at p. 1320.)
Even assuming the government’s interest in raising reimbursement rates is substantial, section 2527 fails to directly advance this interest. There is no question that the Legislature has the authority to directly regulate the rate paid by insurance companies to pharmacies, without any impingement upon free speech. As the majority acknowledges, the Legislature declined to pass such a law. (Maj. opn., ante, at pp. 337-338.) Failing at that, the Legislature passed a statute that compelled speech in a way that the majority acknowledges “could potentially affect prescription drug reimbursement rates.” (Maj. opn., ante, at p. 352.) “The mere transmission of the information, unaccompanied by any requirement that it be considered, utilized, or even read by the insurers, seems poorly designed to accomplish the state’s goal.” (ARP Pharmacy Services, supra, 138 Cal.App.4th at p. 1320.) Such an ineffectual law hardly justifies the statute’s intrusion into free speech rights.
Further, the fit between the governmental goal of increasing reimbursement rates and section 2527’s speech requirement is not sufficiently close to pass *379 muster under intermediate scrutiny. The fit need not be perfect, only reasonable; “ ‘ “not necessarily the single best disposition but one whose scope is ‘in proportion to the interest served,’ that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.” ’ [Citation.]” (Gerawan II, supra, 33 Cal.4th at p. 23.) The majority asserts that the statute made available “commercial information that was previously unavailable and potentially could not be provided by pharmacies because of antitrust constraints.” (Maj. opn., ante, at p. 354.) This assertion seems doubtful. As ARP Pharmacy Services observed, “a restraint on direct negotiation is not a prohibition on gathering and reporting the statistical information called for by section 2527.” (ARP Pharmacy Services, supra, 138 Cal.App.4th at p. 1321.) No law precludes pharmacies from compiling data regarding their own charging practices, or from disseminating such information to the public at large. Compelling speech from an unwilling party when the same speech can easily be voluntarily provided by a willing party hardly provides a proper fit between the government’s objectives and the intrusion into protected speech rights. Rather than making available previously unavailable data, section 2527 does two things. (1) It shifts the cost of compiling and disseminating such data from pharmacies to prescription drug claims processors. (2) It increases the likelihood that the data will be seen by insurance companies and other third party payers because it is specifically targeted at them, as opposed to the public generally. There is simply no justification for the former. As for the latter, the vague hope that payers will consider the data because it is directed at them hardly warrants requiring compelled speech. (Cf. R.J. Reynolds, supra, 696 F.3d at pp. 1217-1221 [concluding that rules requiring graphic warnings on cigarette packages did not pass intermediate scmtiny, in part because they went beyond disclosing health effects of smoking and were intended to discourage smoking].)
In sum, our Constitution has a rich history of protecting commercial speech, one that predates the protections of the First Amendment. The free speech right includes the right not to be compelled to speak. Under our precedents, any law infringing upon that right must be evaluated under intermediate scrutiny, unless it falls within some narrow exceptions. Those recognized exceptions, including statements required to prevent fraud, cure misleading statements, protect consumers, or protect public health and safety, do not apply to section 2527. The provision is a unique statute requiring speech by one contractual party to another in the hope of altering a term of their contract in a way deemed preferable by the government. It is doubtful that our state’s founding fathers, adherents to the principles of Jacksonian democracy and economic individualism, would have countenanced such government-compelled speech within private, arm’s-length negotiations *380 between sophisticated business entities, for the purpose of promoting a particular outcome. I would hold that section 2527 is subject to intermediate scrutiny under article I and that it fails such scrutiny.
Chin, J., concurred.

 See Zauderer, supra, 471 U.S. at page 651; see also Milavetz, Gallop & Milavetz, P. A. v. United States (2010) 559 U.S. 229, 250 [176 L.Ed.2d 79, 130 S.Ct. 1324] (“The challenged provisions of § 528 share the essential features of the rule at issue in Zauderer. As in that case, § 528’s required disclosures are intended to combat the problem of inherently misleading commercial advertisements . . . .”); United Foods, supra, 533 U.S. at page 416 (“There is no suggestion in the case now before us that the mandatory assessments imposed to require one group of private persons to pay for speech by others are somehow necessary to make voluntary advertisements nonmisleading for consumers.”); Ibanez v. Florida Dept, of Business and Professional Regulation, Bd. of Accountancy (1994) 512 U.S. 136, 146 [129 L.Ed.2d 118, 114 S.Ct. 2084] (declining to apply Zauderer standard to a ban on attorneys using specialist designations: “We express no opinion whether, in other situations or on a different record, the *375 Board’s insistence on a disclaimer might serve as an appropriately tailored check against deception or confusion, rather than one imposing ‘unduly burdensome disclosure requirements [that] offend the First Amendment.’ ”).

 See Gerawan I, supra, 24 Cal.4th at page 498; see also New York State Restaurant Assn. v. New York City Bd. of Health (2d Cir. 2009) 556 F.3d 114, 134 (restaurant calorie disclosure regulation enacted to “(1) reduce consumer confusion and deception; and (2) to promote informed consumer decision-making so as to reduce obesity and the diseases associated with it”); Environmental Defense Center, Inc. v. United States E.P.A. (9th Cir. 2003) 344 F.3d 832, 850 (“[(Informing the public about safe toxin disposal is non-ideological . . .”); National Electrical Manufacturers Assn. v. Sorrell (2d Cir. 2001) 272 F.3d 104, 115 (“Vermont’s interest in protecting human health and the environment from mercury poisoning is a legitimate and significant public goal.”).

 See People v. Pulliam (1998) 62 Cal.App.4th 1430, 1438 [73 Cal.Rptr.2d 371] (statute criminalizing loitering to commit prostitution “does not prohibit protected speech”); People v. Maita (1984) 157 Cal.App.3d 309, 316 [203 Cal.Rptr. 685] (“It has been flatly held that ‘[t]he governmental interest in preventing [prostitution] is unrelated to speech or press.’ ”).

 See Roark & Hardee LP v. City of Austin (5th Cir. 2008) 522 F.3d 533, 549-550 (rejecting 1st Amend, challenge against an ordinance banning smoking in enclosed public spaces); United States ex rel. Kneepkins v. Gambro Healthcare, Inc. (D.Mass. 2000) 115 F.Supp.2d 35, 43 (“the *377 tax codes are filled with examples of taxes intended precisely to get people to avoid them, thus discouraging certain unwanted activities (such as excessive smoking or the early withdrawal of retirement savings)”); see also Department of Revenue of Mont. v. Kurth Ranch (1994) 511 U.S. 767, 782 [128 L.Ed.2d 767, 114 S.Ct. 1937] (noting that “[b]y imposing cigarette taxes ... a government wants to discourage smoking”).